**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 19 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

DAVID SARRACINO,

        Defendant - Appellant.

No. 01-2308

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

BRANDON CHEROSPOSY,

        Defendant - Appellant.

No. 01-2310

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

ROBERT MANUELITO,

        Defendant - Appellant.

No. 01-2312

No. 01-2308:
John F. Moon Samore, Albuquerque, New Mexico, for Defendant - Appellant
David Saracino.

Laura Fashing, Assistant United States Attorney (David C. Iglesias, United States
Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff -
Appellee United States of America.

No. 01-2310, submitted on the briefs:
Michael G. Katz, Federal Public Defender, James P. Moran, Assistant Federal
Public Defender, Denver Colorado, for Defendant - Appellant Brandon
Cherosposy.

David C. Iglesias, United States Attorney, Laura Fashing, Assistant United States
Attorney, Albuquerque, New Mexico, for Plaintiff - Appellee, United States of
America.

No. 01-2312:
Michael A. Keefe, Assistant Federal Public Defender, Albuquerque, New Mexico,
for Defendant - Appellant Robert Manuelito.

Laura Fashing, Assistant United States Attorney (David C. Iglesias, United States
Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff -
Appellee United States of America.

Before **EBEL** , **ALDISERT** ,*and **HOLLOWAY** Circuit Judges.

---

 * The Honorable Ruggero J. Aldisert, Circuit Judge, United States Court of
Appeals for the Third Circuit, sitting by designation.

**HOLLOWAY** , Senior Circuit Judge.

Defendants/appellants Robert Manuelito, Brandon Cherosposy, and David Sarracino were jointly indicted, tried, and convicted on a single charge of second degree murder in violation of 18 U.S.C. §§ 2, 1111(b) & 1153. [1] Each now appeals. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We will decide all three appeals in this single opinion.

## I

### *The background facts*

The victim of the homicide was Raynard Martinez, who died from multiple injuries which were admittedly inflicted by the defendants. Other than one neighbor who heard some voices and dimly saw some figures, whom he could not identify, rolling on the ground, the defendants were the only surviving witnesses to the fight that resulted in the death. All three had voluntarily given statements to officials within hours of the beating. These recorded statements were heard by the jury, and transcripts of these statements were also admitted in evidence.

Manuelito and Cherosposy testified at trial as well, while Sarracino did not. The following description of the fracas is condensed from these several versions of

---

[1] The parties stipulated at trial that all three defendants are Indian and that the crime charged had occurred in Indian country within the meaning of section 1153(a). Thus the district court's jurisdiction was clear.

the event.  It should be noted that this summary will gloss over some discrepancies in the evidence.  More importantly, it should be noted that the jury verdict leaves us with no way of knowing how much of the defendants' versions of events the jury credited.  Nevertheless, a summary of the defendants' descriptions of the events should be useful to provide context for the legal arguments.

The assault occurred around three o'clock on the morning of October 30, 1999, within the Laguna Pueblo Indian Reservation in New Mexico, in a portion of the pueblo identified as Encinal Village or the Encinal subdivision.  All three of the defendants lived in Encinal and were members of the Laguna Pueblo tribe.  Manuelito and Cherosposy were nineteen years old at the time; Sarracino was eighteen.  Cherosposy and Manuelito had been together since early on the evening of Friday, October 29.  They had attended a high school football game with some other friends, and after the game had drunk some beer with those friends.  The two of them returned to Encinal around midnight.  Sarracino soon joined them outside Sarracino's house, which was next door to Cherosposy's house, and the three young men were just talking and smoking cigarettes until Martinez arrived about 3:00 a.m.

At first the three defendants noticed a car drive very slowly through the subdivision and then begin to circle through again.  The car pulled into the driveway close to where the three were standing, and Martinez emerged.  Martinez and Cherosposy were cousins, but the other two young men did not know Martinez.

Martinez was normally sober and easy going, but according to a co-worker, Martinez was very upset that evening. He and his wife had separated, and he apparently knew that she was having an affair. Martinez also apparently knew, or suspected, that his wife was staying at Encinal in the home of Wendy Cheromiah. Martinez had visited a bar and had at least two beers after leaving work at around 11:00 p.m. on the evening of October 29, a few hours before the events at issue.

When Martinez encountered the three defendants, he asked where Ms. Cheromiah's house was. After the house had been pointed out to him, according to most versions Martinez walked the short distance to that house and very soon returned to his car. While he was gone, Manuelito opened the door of the car, purportedly to see if anyone else was inside. As Martinez was returning, he seemed to have seen Manuelito closing the car door. He soon began accusing the three of stealing things from his car and became enraged. After some verbal exchanges, Martinez opened the trunk of his car and got out his rifle, which he then loaded. He continued to demand that the defendants return his property while pointing the rifle at them. Then, as the defendants tried to explain that they had not stolen anything, Martinez hit Manuelito with the stock of the rifle, breaking a tooth. He then hit Cherosposy with the rifle. Manuelito and Sarracino then began to try to wrest the gun away from Martinez.

As they wrestled, Manuelito tripped Martinez and the two of them, and perhaps Sarracino also, fell to the ground. Eventually, Sarracino succeeded in getting the gun away from Martinez. Sarracino ran around behind the house and hid the rifle in an old refrigerator. Manuelito and Sarracino had hit and kicked Martinez a number of times during the melee, and Manuelito continued kicking him after Sarracino removed the rifle from Martinez's grasp. Then, Cherosposy, who had not been part of the fighting, came up and kicked Martinez in the body once or twice.

With Martinez completely subdued, according to the defendants' out of court statements and testimony at trial, the defendants helped Martinez to his feet and agreed to take him home. According to the trial testimony, Martinez was conscious, talking with the defendants, and able to get into the back of his car with little or no assistance. Manuelito and Cherosposy got into the front of the car, with Manuelito driving. Cherosposy said that Martinez lived in Acoma (or Acomita), about eight miles away. After they had driven a short way, Manuelito and Cherosposy realized that they would have no way to get home themselves if they drove Martinez to his home and left his car with him. At that point, Martinez reportedly told the two to just leave him where they were. Manuelito and Cherosposy, however, thought it would be better to get off the road they were on so that Martinez could "sleep it off" without being found by the police and getting arrested. They turned onto a road that led to a site that had formerly been a trash dump but had since been covered over.

The two stopped the car there and returned to Encinal on foot. Cherosposy walked with his shoes off for part of the way. He testified that he did this because he was picking burrs out of his shoes.

A resident of Encinal noticed the car at the old dumping grounds when it got light the next morning. The resident looked out occasionally and eventually called the police when the car had remained there for some time. Officers responding to the call found Martinez's body in the back seat of the small car. He was lying face down and his legs were folded up behind him to fit in the confined space. As more officers gathered to investigate, two sets of footprints, Manuelito's and Cherosposy's, were followed to the Encinal subdivision. Manuelito and Sarracino had been playing basketball that afternoon. When they returned to Manuelito's house, they saw that the area in front of Sarracino's home where the struggle took place had been marked off with yellow crime scene tape. Manuelito called Cherosposy, who was at his girlfriend's house in Casa Blanca, ten or fifteen miles away. Manuelito told Cherosposy to come to Encinal so the three of them could "see what's up." X R. 694.

Cherosposy returned to Encinal and met the other two defendants at Manuelito's house. The three of them then walked together toward Sarracino's house. They encountered an officer on the way and told him that they had something to say. The three defendants were then separated. Each consented to be interviewed

and for a portion of the interview to be recorded on audio tape. Each also agreed to provide the clothes he had been wearing during the fight, although Manuelito had previously washed blood from his shoes. The defendants were arrested following the interviews.

The prosecution's medical witness, Dr. Patricia Aronica-Pollak, testified that the victim had died from blunt trauma to the head, neck, chest and abdomen. There were a number of external injuries, cuts and bruises, which could have been caused by punching or kicking. Internally, the victim suffered a subdural hemorrhage. Blood surrounded the brain, which was swollen and bruised. This caused the brain to press on the vital areas at the base of the skull, which could stop breathing and the heartbeat. Two ribs were broken but not displaced. The doctor said that it was possible that the victim could have remained conscious immediately after receiving such a beating. The first stages of brain swelling could have caused him to mumble, lose coordination, and feel sleepy, effects similar to intoxication.

The expert said that all of the traumatic injuries to the head, neck, chest and abdomen contributed to Martinez's death. The bleeding and swelling in the brain was a very serious, lethal factor and would not have been visible or apparent to the defendants. The expert said that the victim would have had at least some chance to survive if he had received immediate medical care.

## II

*No. 01-2312: Mr. Manuelito's Appeal*

Mr. Manuelito raises several issues for reversal of his conviction. First, he contends that he should have been tried separately rather than with his co-defendants. Second, he argues that the trial judge improperly limited his attempts to impeach a prosecution witness. Third, he asserts that unduly inflammatory photographs of the victim and the prosecution's use of those photographs denied him a fair trial. Finally, he argues that cumulative error requires reversal, even if this court should conclude that no alleged error by itself merits reversal.

## A

*The severance issues*

Manuelito argues that denial of his motions for severance violated his right to confront the witnesses against him, a right guaranteed by the Sixth Amendment, and he relies principally on the landmark decision in *Bruton v. United States*, 391 U.S. 123 (1968). "We review *de novo* the legal issue of whether the admission of the non-testifying codefendant's statements/confession in a joint trial violated the defendant's Sixth Amendment right to confrontation." *United States v. Verduzco-Martinez*, 186 F.3d 1208, 1212 (10th Cir. 1999). The government, however, contends that this issue has been waived, so we must first consider whether to apply the standard of review just stated or only the standard of plain error.

**1**

*Has this issue been preserved for review?*

Counsel for Mr. Manuelito moved unsuccessfully for a severance before trial. At a hearing on pretrial motions, the judge and counsel discussed the possibility of handling the *Bruton* problems by redacting portions of the defendants' pretrial statements.[2] Counsel for Mr. Manuelito agreed to cooperate in an effort by all counsel to see if an agreement on redactions could be reached, but counsel stated that he did not wish to waive his objection to a joint trial. VI R. 18. We believe that counsel's position was clear and that the severance issue was not waived at that point.[3]

The government also contends that the objection was waived when counsel did not restate the objection when the statements of the co-defendants were actually

---

[2]*See, e.g., Richardson v. Marsh*, 481 U.S. 200 (1987), on the use of redactions of references to the defendant from statements by a co-defendant to address *Bruton* issues. The Court later recognized that redaction may not satisfy the concerns of *Bruton* where it would still be obvious to the jury that the co-defendant's out-of-court statement had referred to the defendant. *See n.3, infra*.

[3]It is apparent that redaction to satisfy *Bruton* would have been very difficult at best and probably impossible under the circumstances. Redactions which leave it obvious to whom the co-defendant's statement refers do not suffice to cure the problem. *See Gray v. Maryland*, 523 U.S. 185 (1998). With three statements all describing the same events, redactions would no doubt have left it obvious that each defendant's statement referred to the other two. Additionally, Manuelito asserts that redacted statements should not remove potentially exculpatory evidence. Apparently this is a reference to the fact that all three statements here described the victim as the aggressor and were consistent in other respects as well.

introduced at trial, citing *United States v. Sauza-Martinez*, 217 F.3d 754, 759 (9th Cir. 2000), and *United States v. Jobe*, 101 F.3d 1046, 1067-8 (5th Cir. 1996). Manuelito's reply brief does not address this contention. Thus, neither side has cited controlling precedent from our court, and our research has not uncovered a precedential case either. In *United States v. Kaatz*, 705 F.3d 1237, 1243-44 (10th Cir. 1983), we held that the issue was forfeited when no objection had been made upon the introduction of the evidence subject to *Bruton*. But in that case there had been no motion to sever and so no opportunity at all for the trial court to consider the issues. We do not believe that *Kaatz* requires us to treat the severance issue as forfeited and to apply plain error review in its disposition.

While this question is close here, we feel that the alleged severance error was sufficiently preserved. However, as we will explain, we do not believe that Mr. Manuelito can prevail even with the less deferential standard of review which applies where an issue is preserved, rather than the stricter plain error standard we follow where an issue is not preserved.

**2**

*Bruton v. United States*

We proceed to an overview of the relevant law. In *Bruton v. United States*, 391 U.S. 123 (1968), the Court held that the admission in evidence of a co-defendant's confession inculpating the defendant at a joint trial at which the co-

defendant does not testify violates the defendant's Sixth Amendment right to confront witnesses against him. In so holding, the Court created an exception to the rule that jurors are presumed to follow all instructions. At trial in that case, the jury had been instructed that the co-defendant's out-of-court statements were admissible in evidence only against the co-defendant and could not be considered in determining Mr. Bruton's guilt or innocence. Such limiting instructions are routinely used with respect to many kinds of evidence. But the Court held that the impact of a confession that incriminates another is likely to be too great for the jurors to be able to put the matter out of their minds in considering the case against the other:

> "[W]hen the admissible confession of one defendant inculpates another defendant, the confession is never deleted from the case[,] and the jury is expected to perform the overwhelming task of considering it in determining the guilt or innocence of the declarant and then of ignoring it in determining the guilt or innocence of any codefendants of the declarant. A jury cannot 'segregate evidence into separate intellectual boxes.'"

*Bruton*, 391 U.S. at 131 (quoting *People v. Aranda*, 407 P.2d 265, 271-72 (Cal. 1965)).

We have noted, however, that the exception created by *Bruton* is a narrow one. "*Bruton* applies only in those few contexts where the statement is so inculpatory as to the defendant that the 'practical and human limitations of the jury system cannot be ignored.'" *United States v. Rahseparian*, 231 F.3d 1267, 1277 (10th Cir. 2000) (quoting *Bruton*, 391 U.S. at 135). In *Rahseparian*, we cited *Richardson v. Marsh*,

481 U.S. 200, 208 (1987), in holding that the *Bruton* rule does not apply to "statements that are not directly inculpatory but only inferentially incriminating." *Id.* at 1277. *See also United States v. Markopoulos*, 848 F.2d 1036, 1039 (1988). The Supreme Court has indicated that it also reads *Richardson* as "plac[ing] outside the scope of *Bruton*'s rule those statements that incriminate inferentially." *Gray v. Maryland*, 523 U.S. 185, 195 (1998).

On the other hand, we have held that *Bruton* does apply, even if the co-defendant's statement is not facially or directly inculpatory, when the statement is evidence of a fact critical to the prosecution's case. *United States v. Glass*, 128 F.3d 1398, 1404 (10th Cir. 1997) (discussing the second and third of three statements admitted in violation of *Bruton*).

**3**

Manuelito focuses on three specific segments of the out-of-court statements by his co-defendants. One is a statement that Cherosposy reportedly made about Manuelito losing control and having to be pulled off the victim. When asked in cross-examination by the prosecution if he had made such a statement, Cherosposy denied it. As part of its rebuttal case, the government called the father of Cherosposy's girlfriend, Mr. Delores, who testified that Cherosposy had made the statement, apparently after Manuelito had told Cherosposy on the telephone that police were in the village and that the scene of the fight had been marked off as a

crime scene. This statement was not admissible against Manuelito, only against Cherosposy. The second was Sarracino's October 30 statement that he heard the victim make a "gargling" sound when he was being helped or put in the back of the car before Manuelito and Cherosposy drove off with the victim. The third was Cherosposy's October 30 statement to the investigator, Brown, that Cherosposy and Manuelito picked the victim up and put him in the car, indicating that he wasn't able to get in by himself, contrary to other accounts by the three defendants (that is, contrary to Manuelito's and Sarracino's statements to the investigators and contrary to Manuelito's and Cherosposy's trial testimony).

Because Mr. Cherosposy testified at trial, the rule of *Bruton* applies only to the pre-trial statement of Mr. Sarracino, who did not testify.[4] We will consider the arguments directed to Mr. Cherosposy's statements *infra*, after dealing with the *Bruton* issue.

We must first consider whether this is an inculpatory statement within the *Bruton* rule. We conclude that it is. Although the defendants no doubt intended their statements to the investigators to be exculpatory accounts of self-defense against an armed aggressor, Sarracino's statement – like those of the other defendants – admitted their involvement in the fracas and included points that were damaging to their defense. On appeal, Mr. Manuelito emphasizes the fact that the prosecution at

---

[4]*See Nelson v. O'Neil*, 402 U.S. 622 (1971); *United States v. Wolf*, 839 F.2d 1387, 1396 n.6 (10th Cir. 1988).

trial seized on discrepancies in the statements of the three defendants and also repeatedly referred to portions of the statements that it contended were particularly damning. And one such statement was Mr. Sarracino's description of the victim having made a "gargling" sound at the time the other defendants departed in the victim's car with the victim in the backseat. Although this detail might have appeared innocuous, the prosecution used it repeatedly in the trial. The government's expert witness, Dr. Aronica-Pollak, said that the victim had aspirated blood and that as a result, he might have made such a noise as he breathed.

We conclude that the admission of co-defendant Sarracino's statement violated Manuelito's confrontation right and the rule of *Bruton*.

**4**

*Harmless error*

Although the rule of *Bruton* is a narrow one, when evidence has been admitted in violation of the rule, as in this case, the defendant's right of confrontation has been violated, and we must reverse unless we can conclude beyond a reasonable doubt that the constitutional error was harmless. *Chapman v. California*, 386 U.S. 18, 24 (1967); *United States v. Hill*, 901 F.2d 880, 884 (10th Cir. 1990). As we have further explained this standard:

> To hold an error of constitutional dimension harmless, we must conclude "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt

that the improper use of the admission was harmless error." We review the record de novo, and our judgment is informed by the context in which the statement was admitted, how it was used at trial, and how it compares to the properly admitted evidence.

*United States v. Glass*, 128 F.3d 1398, 1403 (10th Cir. 1997) (quoting *Schneble v. Florida*, 405 U.S. 427, 430 (1972) (citation omitted)). In addition, we consider whether and how the confession was used in argument as we gauge its effect. *Id.* (citing *Bond v. Oklahoma*, 546 F.2d 1369, 1376 (10th Cir. 1976)). "Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the two confessions on the minds of an average jury." *Harrington v. California*, 395 U.S. 250, 254 (1969). *See also Chase v. Crisp*, 523 F.2d 595, 598 (10th Cir. 1975).

It is true, as noted, that the prosecution made several references to Sarracino's description of the victim making a "gargling" sound, including in closing argument. However, our *de novo* review is of the entire record. Considering the totality of the evidence, we conclude that here the *Bruton* error was harmless beyond a reasonable doubt.

Mr. Manuelito's own statement and his trial testimony established that the three defendants had beaten and kicked the victim. The issues at trial were whether the defendants had acted only in self defense or whether they went beyond what was necessary to defend themselves. The jury was instructed that a person may use "as much force as was reasonably necessary to protect himself from bodily harm," but

is not entitled to use "any greater force than he had reasonable grounds to believe and actually did believe to be necessary to save his or another's life or to avert serious bodily harm." (Instruction 11.) If the jurors decided that the defendants had exceeded the limits of self defense, then they were to determine, as to each defendant individually, whether the crime committed was involuntary manslaughter, voluntary manslaughter, or second degree murder. (Instructions 8-10.) The distinguishing element among these three crimes is the defendant's mental state, with the jury verdict of guilty on the second degree murder charge requiring a finding of malice.

The court gave the jurors substantial guidance on the meaning of "malice" as an element of murder in the second degree. We believe it is helpful to quote extensively from the court's instruction, to which there were no objections:

> "Malice aforethought" is a condition of a person's mind. As stated above, you must decide whether the defendants had malice aforethought. Because no one can look into the mind of another, the only way to decide this issue is to examine the defendants' actions and the circumstances surrounding defendants' actions. Malice aforethought is an extreme mental state evincing a wanton or reckless disregard for human life. If you find that the defendants intended to kill or seriously injure the victim, then the second degree murder requirement of malice aforethought is satisfied.

> The malice aforethought requirement is also satisfied if you find the defendants were indifferent to the life of the victim or had ill will, hatred, or evil intent without regard to the consequences. In other words, you must assess whether the acts of defendants were done in an extreme mental state of recklessness that display[ed] such an extreme and wanton disregard for human life as to constitute "malice." Thus, you may also find malice aforethought if defendants' disregard for human life is so extreme that it approaches but does not equal a mental

state comparable to that of a person who deliberately and intentionally kills another.

You also are permitted to find malice aforethought within the meaning of these instructions if you find that a person, while aware of a serious risk of death, failed to act after having put another human being in a position of danger and creating for himself a duty to rescue or to safeguard that other human being.

Instruction 8.

The last quoted paragraph of this portion of the instruction is particularly important here as the prosecution emphasized in closing argument that the defendants failed to act to help the victim after the fighting concluded. For example, in closing argument one of the prosecutors said:

Malice aforethought is a fancy phrase that means, in part, that if a person, while aware of a serious risk of death, failed to act after having put another human being in a position of danger and creating for himself a duty to rescue or to safeguard that other human being. It's an extreme mental state of recklessness where the defendants are aware of a serious risk that somebody might die.
  Now, that's exactly what happened here. These defendants created for themselves a duty to save this man. And the way that they did that is by going too far and beating him. After they beat him, their duty was to help him. That's what the law says. . . . . And instead of complying with that duty, instead of helping the man, instead of once calling 911, making an anonymous call to the police, calling an ambulance, what they did was leave him to his own devices to die.

XI R. 1009-10.

We must assess whether the admission of evidence in violation of *Bruton* can be held to have been harmless in consideration of the other evidence that supported the finding of malice. The improperly admitted evidence (improperly admitted as to

Manuelito, that is) that the victim had made a gargling sound was, the prosecution argued, evidence of the victim's severe injuries and thus of the defendants' extreme recklessness in failing to act to protect the victim after the beating had put him in a position of danger.

The medical evidence and photographic evidence of the severity of the beating inflicted on the victim could have alone supported the malice finding. For example, Dr. Aronica-Pollak testified that the victim had sustained numerous lacerations, abrasions, and contusions to the face and head that were externally visible. VIII R. 128-39. Internally, there was evidence of hemorrhaging and contusion in the area immediately under the scalp, and below that there was subdural hemorrhaging. *Id.* at 140-42. "Significant force" was required to inflict these injuries. *Id.* at 143. Two of the victim's ribs had been broken. *Id*. at 160. The autopsy revealed also that the victim had received a blow to the abdomen which had caused a tear in the layer of fat over the transverse colon, an injury that also required a "significant amount of force." *Id.* at 161-62. There had been significant bleeding from the face and scalp.

Mr. Laducer testified that there was a quantity of blood in the floor and seat of the car where the victim was found and that the blood had dripped out of the car door onto the ground. *Id.* at 269-70. Officer Otero, who first found the body, described it as a "pool of blood" on the ground outside the car. IX R. 494.

Next we turn to the defendants' explanation of transporting the victim to the old dump site where he was abandoned. The defendants' tale strains credulity. Their evidence was that Manuelito and Cherosposy set out to take the victim home, and only after having begun the trip did it occur to them that they themselves would be stranded when they reached the victim's home. It was then that the victim himself suggested that the two just leave him. But rather than leave him where they were at that time, the two decided to go off on the side road to the dump out of concern for the possibility that the victim might be found by the police – a concern which they said was on behalf of the victim because they did not want him to get in trouble for being drunk.

All parts of this story seem difficult to believe, but incredulity is heightened still more when we realize that the jury probably did not believe that the victim was conscious, much less responsive to the defendants' concern about how they would eventually get back to their homes. Not only were the victim's injuries severe, but the position in which the body was found was described as very unnatural. The victim was lying face down, with his head off the car seat, and his legs "were folded up, propped up, up against the door, crossed." IX R. 492. If the victim had been sitting up, as defendants claimed, he could have slumped over into a position where he was facing down, but that would not explain how the legs came to be positioned

as they were. This evidence strongly suggests that the victim was unconscious when the defendants put him in the car.

The evidence overwhelmingly points to the conclusion that the defendants knew that the victim was severely hurt, that the victim was in fact unconscious when the beating finally ended, and that all three defendants consciously decided to remove the victim from the scene in hopes of avoiding detection of the crime. In the context of the entire record, the admission of the statement by Mr. Sarracino that the victim had made a gargling sound, even as that statement was repeatedly used by the prosecution, was harmless beyond a reasonable doubt in light of the overwhelming evidence against the defendants. *See Harrington v. California*, 395 U.S. 250, 254 (1969). As the Supreme Court has said in holding a *Bruton* error to have been harmless: "In this case, we conclude that the 'minds of an average jury' would not have found the [prosecution's] case significantly less persuasive had the testimony as to [the co-defendant's] admission been excluded." *Schneble v. Florida*, 405 U.S. 427, 432 (1972) (quoting *Harrington*, 395 U.S. at 254).

**5**

*Other severance issues*

As we have noted, Manuelito also contends that it was error to deny his motions to sever because of the prejudicial effect of two other pieces of evidence.

We have alluded to these statements earlier, but now will describe them more fully before reaching the legal arguments raised concerning them.

One of the statements that Manuelito argues was unfairly prejudicial was Mr. Cherosposy's statement to the investigator, Brown, that Cherosposy and Manuelito had to pick the victim up and put him in the car. This statement was admissible against Cherosposy under Fed. R. Evid. 801(d)(2) as an admission by a party-opponent, but not admissible against Manuelito. But because Cherosposy testified, admission of the out of court statement did not violate *Bruton*. See n.4, *supra*. We quote the part of the statement at issue:

> JB[5]: How did he oet [sic] into the car?
> BC: We picked him up.
> JB: You picked him up. You had to pick him up?
> BC: Yeah.

Govt. Ex. 20A.

The second part of the evidence addressed in this contention is the rebuttal testimony of Mr. Delores, the father of Cherosposy's girlfriend, that Cherosposy had said that Manuelito "lost it," or became enraged, after being hit in the face with the rifle by Mr. Martinez, and that the other two men, Cherosposy and Sarracino, then had to pull Manuelito off of the victim. This again was evidence which was properly admitted against Cherosposy but was inadmissible as to Manuelito.

---

[5]The initials are those of the investigator who interviewed defendant Cherosposy, Laguna Pueblo Officer Jeremy Brown, and of Brandon Cherosposy.

The standard of review for denial of a motion to sever is abuse of discretion. *United States v. Morales*, 108 F.3d 1213, 1219 (10th Cir. 1997). A severance should be granted when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). This may occur when the government presents evidence, as it did here, which is "probative of a defendant's guilt but technically admissible only against a co-defendant." *Id.* However, severance is not required even if prejudice is shown; "tailoring of the relief to be granted, if any, [is left] to the district court's sound discretion." *Id.* Serious risk of prejudice, from the jury considering evidence against a defendant which is only admissible against a co-defendant and would not be admitted against the defendant in a separate trial, is increased when many defendants are tried together "in a complex case and they have markedly different degrees of culpability . . . ." *Id.* Here, the case is not complex and the defendants do not have markedly different degrees of culpability. We assess the issues with that in mind.

As to Cherosposy's account of how the victim was picked up and put in the car, we think that this was not so prejudicial as to require a severance. This evidence was not that dramatically different from Mr. Manuelito's own testimony on that point. Manuelito testified on direct examination as follows:

Q. Okay. What did you do then?

A. Well, then I asked Brandon [Cherosposy] – because I figure Brandon knew where he lived – I asked Brandon, I said, "Hey, where does he live?" He said Acoma. I was like, all right. So then I offered to help Mr. Martinez up from the ground. I kind of like bended [sic] over him and grabbed his right arm. He kind of lifted his right arm, and I grabbed it and pulled him up.
Q. Was his right arm just laying on the ground?
A. Not really, he was kind of like –
Q. Did he reach up to you?
A. I don't know if he was reaching up to me or like trying to like feel his body or something, but I remember I grabbed his hand, and I helped him get up.
Q. Okay. What happened then?
A. Then right now I pulled Mr. Martinez up, and I kind of like help him up, and Brandon comes over, and we both help Mr. Martinez up. We both kind of walk him to the car, to his car.
Q. How far were you from his car?
A. Right now, we're like about eight feet away from his car.
Q. Okay. And what happened then?
A. By this time I could see David coming out or just coming to the car, and he opens the back passenger door. He opens it up, and we kind of sit [sic] Mr. Martinez down in the back seat.

X R. 740-41.

We do not believe that the discrepancy between Cherosposy's statement, which was inadmissible hearsay against Manuelito, and Manuelito's own trial testimony is enough to have "prevent[ed] the jury from making a reliable judgment about guilt or innocence," the standard set out in *Zafiro*, *supra*.

We turn then to the testimony of Mr. Delores. Mr. Cherosposy had gone to the Delores home on the afternoon of October 30 (*i.e.,* within a few hours of his return from leaving the victim at the dump site) to see his girlfriend. While there he received two telephone calls. Mr. Delores testified about statements Cherosposy had

-24-

made to him after receiving the second call. As related above, Mr. Delores testified that Cherosposy had said that Mr. Manuelito had "lost it" during the fight and that Cherosposy and Sarracino had to pull Manuelito off of the victim. This testimony was admissible against Cherosposy as an admission against interest, but was not admissible against Manuelito.[6] This testimony came in the government's rebuttal after Mr. Cherosposy had denied having made any such statements during his cross-examination by the prosecution. XI R. 1101-02.

Mr. Manuelito's counsel did not object to this evidence at trial, nor did counsel renew the motion to sever. Accordingly, our review is only for plain error. Before an appellant in a criminal case is entitled to relief under the plain error doctrine, he must clear several hurdles. We have described these as follows:

> [T]he error must (1) be an actual error that was forfeited; (2) be plain or obvious; and (3) affect substantial rights, in other words, in most cases the error must be prejudicial, i.e., it must have affected the outcome of the trial. . . . . Given plain error that affects substantial rights, an appellate court should exercise its discretion and notice such error where it either (a) results in the conviction of one actually innocent, or (b) "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

*United States v. Keeling*, 235 F.3d 533, 538 (10th Cir. 2000) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)) (internal citations omitted). We do not think

---

[6]The trial judge rejected the government's argument that the statement was admissible as an excited utterance, which would have made it admissible against Manuelito as well as Cherosposy.

that this issue rises to the level of seriously affecting the fairness, integrity or public reputation of the proceedings.

Although this "lost it" statement certainly could have been damaging to Manuelito's defense, the overall evidence shows that Martinez was injured much more severely than any of the three other participants in the melee. Moreover, by his own testimony Manuelito struck more blows than Cherosposy and quite likely more than Sarracino, who at one point left the fight and ran around to the other side of the house to dispose of the victim's rifle. We therefore conclude that the prejudice suffered from this evidence was not so great as to permit us to reverse the judgment under the plain error rule.

Manuelito also contends that it was plain error for the court not to have given, immediately and *sua sponte,* a limiting instruction telling the jurors that the evidence about the "lost it" statement was to be considered only against Cherosposy and not against Manuelito.

Ordinarily, a party desiring a limiting instruction must request it. Fed. R. Evid. 105. Mr. Manuelito cites *United States v. Sauza-Martinez*, 217 F.3d 754, 758-61 (9th Cir. 2000), in which the court held that it was plain error for the trial judge not to *sua sponte* give a limiting instruction immediately on the admission of damaging testimony which was inadmissible against one of the defendants. We are unpersuaded by *Sauza*. No doubt it would have been prudent for the trial judge to

give the instruction *sua sponte* because this part of Mr. Delores' testimony was obviously more pointed at Manuelito, against whom it was not admissible, than against Cherosposy, against whom it was admissible. But considering the record as a whole, we do not think that the failure to do so was plain error, nor that it determined the outcome of the trial.

**B**

*Limits on cross-examination of a lead investigator*

Mr. Darrell Laducer was an investigator for the Bureau of Indian Affairs when he was called to investigate the discovery of the victim's body. Laducer testified at trial in the government's case in chief and also in rebuttal. Sometime after the death of Mr. Martinez, Laducer had gotten in trouble with his employer and had resigned while under investigation for misuse of a government computer. Counsel for Mr. Manuelito wished to cross-examine Mr. Laducer on this matter. Counsel argued that Mr. Laducer might be biased in favor of the government because he could possibly have faced criminal charges over the improper computer use. The district court rejected counsel's argument and ruled that Mr. Laducer could only be asked if he was still employed as a government investigator. Manuelito now argues that he was denied his right of confrontation by this limitation on the cross-examination of Laducer.

Our review is *de novo* as to whether the limitation on cross-examination infringed the constitutional right of confrontation. *United States v. Sinclair*, 109 F.3d 1527, 1537 (10th Cir. 1997). But, the district court has wide latitude to impose reasonable limits on cross-examination. *Id.* This court is to determine whether the jury had sufficient information to make a discriminating appraisal of the witness's motives and bias. *Id.* (citation and quotation marks deleted).

Securing the opportunity to cross-examine witnesses is the essential purpose of the constitutional right to confront witnesses. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (citing *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)). The Court in *Van Arsdall* and *Davis* recognized that showing a witness's motivation or bias is an important function of cross-examination. In each of those cases, the Court held that the right of confrontation was infringed when the trial judge excluded an entire area of possible bias of a government witness from inquiry by defense counsel. We have applied the teachings of *Van Arsdall* and *Davis. See Jones v. Gibson*, 206 F.3d 946, 955-57 (10th Cir. 2000). Further, as Manuelito points out, we have implicitly found a violation of the right of confrontation in circumstances where, like the instant case, the impeachment material concerned possible, not pending, criminal charges. *Nuckols v. Gibson*, 233 F.3d 1261 (10th Cir. 2000).[7]

---

[7] We say implicitly because *Nuckols* turned on a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), but it is clear that the holding rested on the fact that the information withheld in violation of *Brady* was evidence that could have
(continued...)

In light of these authorities, we hold that the ruling forbidding the defense from inquiring into the reason for the termination of Laducer's employment with the BIA was constitutional error. We must determine, then, if the error was harmless beyond a reasonable doubt under *Chapman*. Our framework for analysis is clear:

> The factors bearing on the effect of the excluded testimony include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

*United States v. Ellzey*, 936 F.2d 492, 497 (10th Cir. 1991) (quoting *United States v. Van Arsdall*, 475 U.S. at 684). In our view, it is clear that most of these factors support the government and that the error was harmless.

The government points out that most of Laducer's testimony was corroborated by other evidence. Manuelito, however, focuses on one point in the testimony which was not corroborated. In his trial testimony, Manuelito sought to explain why he had left out some details of the events when he gave his statement to Laducer on the day of the fight. He testified that he had not learned of the victim's death until Laducer told him after the taped interview. X R. 750. As for the brevity of his statements in the taped interview, he said that he was inexperienced in talking with investigators

---

[7](...continued)
been used to impeach a critical government witness. Thus, we said that the habeas petitioner had been prejudiced "[b]ecause impeachment of the witness who held the key to successful prosecution was denied to the defense . . . ." 233 F.3d at 1267.

and suggested that he did not realize the importance of the matter because he did not know that the victim had died. *Id*. at 728, 770-71. The prosecution recalled Laducer in its rebuttal case and elicited testimony that Laducer had never told Manuelito that the victim had died. The prosecution then argued in closing that this somehow showed that Manuelito had known that the victim had died, or at least that he likely had died, because of the severity of the beating. XI R. 1003-04.

The logic of the argument used at trial that this discrepancy indicated that Manuelito knew without being told that the severe beating likely had resulted in the victim's death is less than compelling. We believe, therefore, that it was unlikely to have had any impact on the verdict. Considering the overall strength of the government's evidence, we have no doubt that the error was harmless beyond a reasonable doubt.

## C

### *Admission of gruesome photographs of the victim*

Mr. Manuelito contends that he was prejudiced by the admission in evidence of photos of the deceased which were, he says, gruesome and were used in a misleading way.

There are two photos at issue here. One is a photo that was taken in the autopsy room. Manuelito's primary complaint about this photo is that the towels around the victim's head make it look as if the victim had been decapitated.

However, the government's pathologist, Dr. Aronica-Pollak, told the jurors that the towels were there to cover blood and make the photo less gruesome; she assured the jurors that the head had not been severed. VIII R. 149-50. We agree with the trial judge that this photo, although somewhat gruesome, was not unduly so and was admitted for a proper purpose of assisting the government's medical expert in her description of the injuries the victim had sustained.

The other photo at issue was taken before the body was removed from the car and showed the condition of the body when it was found. All that had been done was to set the victim up so his face could be seen. The problem is that the prosecution argued that this was evidence of the appearance of the victim when the defendants left him. This was not supported by the government's evidence. The prosecution's expert testified that the discoloration and swelling would have increased during the interval before the body was found, especially so because the victim had been lying face down. Indeed, Dr. Aronica-Pollack testified on cross-examination that she had no idea how the victim would have "presented" if he had been taken to an emergency room right after the beating. VIII R. 183, 191.

Although this testimony by the government's witness could have been effective to counter any suggestion that the photo accurately portrayed the condition of the victim when the defendants abandoned him, the prosecution in closing argument pointedly made the argument to the contrary – that the photo did show that

the defendants had to have known that the victim was badly injured and needed immediate medical attention. XI R. 1007. But no objection was made at that point.

We believe that the photos had significant probative value. The bloodied head and face of the victim gives an *indication*, although admittedly an imperfect one, of how the victim must have appeared to the defendants at the end of the fight. Without these photos, the prosecution would have been handicapped in its ability to convey the nature and extent of the beating to the jurors. We have already noted that the depiction is not exact; his appearance no doubt was worse after he had been lying face down for some hours. The jurors were told that from the government's own medical witness, however.

We conclude that it was not an abuse of discretion to admit the photos because their probative value was not substantially outweighed by the unfair prejudice. Fed. R. Evid. 403.

**D**

*Cumulative error*

We have two errors, the admission of defendant Sarracino's out-of-court statement, which we found to have been in violation of *Bruton v. United States*, and the limitation on cross-examination for bias of one government witness. In considering Manuelito's claim of cumulative error, our process is like that employed already in assessing the impact of each error by itself:

A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Unless an aggregate harmlessness determination can be made, collective error will mandate reversal, just as surely as will individual error that cannot be considered harmless. The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error – courts look to see whether the defendant's substantial rights were affected.

*United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). Because the errors here were constitutional, the *Chapman v. California* standard of harmless beyond a reasonable doubt also applies in the cumulative error analysis. *Id*. at 1470, n.6.

Considering the likely impact of both identified errors, we are convinced that they were harmless beyond a reasonable doubt collectively as well as individually. Mr. Manuelito received a fair trial, although not a perfect one.

**E**

In sum, in Manuelito's appeal we find no reversible error as to the conviction or the sentence, and we affirm both the judgment of conviction and the sentence.

**III**

*No. 01-2310: Mr. Cherosposy's Appeal*

The general facts of these appeals have been detailed in the discussion of the appeal of Manuelito. Therefore in this portion of the opinion which treats

Cherosposy only we will deal with facts related to Cherosposy's specific claims of error.

**A**

*Exclusion of Dr. Griest's testimony*

Cherosposy asserts that the district court committed reversible error that was prejudicial in excluding the testimony of the defendants' expert witness, Dr. Karen Griest, as a sanction for violating discovery rules. Appellant's Opening Brief at 13. We do not agree.

This court reviews the district court's exclusion of an expert's proposed testimony for abuse of discretion. *United States v. Diaz,* 189 F.3d 1239, 1246 (10th Cir. 1999), *cert. denied,* 529 U.S. 1031 (2000). Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure requires that a "defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if − . . . the defendant requests disclosure under subdivision (a)(1)(G) and the government complies."[8] In other words, so "long as the government complies with its own disclosure obligations, Rule 16(b)(1)(C) . . . requires that the defendant disclose to the government a written summary of an

---

[8] Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure states that at "the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief."

expert witness's proposed testimony."   Appellee's Answer Brief at 30.   The government points out that "none of the defendants claimed that the government's disclosure of its expert testimony was inadequate." *Id.* at 31.

If a party fails to comply with Rule 16, the court may order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; grant a continuance; prohibit that party from introducing the undisclosed evidence; or enter any other order that is just under the circumstances.  Fed. R. Crim. P. 16(d)(2)(A)-(D).  This court has held that it would be "a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings." *United States v. Golyansky*, 291 F.3d 1245, 1249 (10th Cir. 2002).  We have noted that the sanction of exclusion of a witness's expert testimony is "almost never imposed 'in the absence of a constitutional violation or statutory authority for such exclusion.'" *United States v. Charley*, 189 F.3d 1251, 1262 (10th Cir. 1999) (quoting *United States v. Gonzales*, 164 F.3d 1285, 1292 (10th Cir. 1999)).

Cherosposy asserts that there was no rational justification for the district court's ruling in this case and its action was an abuse of discretion.  He points out that the court never examined the reasons for the defense's delay in producing the material.  Prejudice to the government, if there was any, was not explored.  Finally,

the district court never considered an alternative remedy besides exclusion of the expert evidence. Appellant Cherosposy's Opening Brief at 16-17.

After reviewing the transcript of the proceedings of November 9, 2000, we agree with Cherosposy that the district judge erred in excluding the expert's evidence. The district judge did not develop a sufficient record of the reasons for his decision to exclude this evidence. Following his decision to exclude the testimony of Dr. Griest, the district judge requested that counsel approach the bench again and stated the reason for his ruling: "[T]he prosecution has not had an opportunity to review, nor has the prosecution's witness had an opportunity to review the opinion and the basis for the opinions of the defense expert prior to the prosecution witness' testimony. And . . . in my view, that is critical to the fair application of Rule 16." VIII R. 120 (Transcript of 11/09/00 proceeding). The district judge erred by imposing the extreme sanction of excluding an expert witness' testimony without making a record of following the three-pronged approach that this court has set out for selecting a proper sanction for a violation of Rule 16. *See Golyansky*, 291 F.3d at 1249 (holding that the district court should consider (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to the defendant as a result of the delay; and (3) the feasibility of curing any prejudice with a continuance.)

However, we hold that this error was harmless.  Once we determine that the district "court erred in its decision concerning the admission or exclusion" of evidence, we consider whether the error was harmless.  *United States v. Howell*, 285 F.3d 1263, 1270 (10th Cir. 2002).  A non-constitutional error whether to admit or exclude evidence is "considered harmless 'unless a substantial right of [a] party is affected.'"  *Charley*, 189 F.3d at 1270 (quoting Fed.R.Evid. 103(a)).  An error affecting a substantial right of a party is an error which had a "substantial influence" or which leaves one in "grave doubt" as to whether it had such an effect on the outcome.  *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).  When conducting our "harmless error analysis, we review the record as a whole."  *Charley*, 189 F.3d at 1270 (citation omitted).  Harmless error analysis is "not the same as sufficiency of the evidence analysis."  *Charley*, 189 F.3d at 1270 (citing *United States v. Tome*, 61 F.3d 1446, 1455 (10th Cir. 1995) (stating that "[t]he question is not whether, omitting the inadmissible statements, the record contains sufficient evidence for a jury to convict the defendant")).  The burden of proving that an error is harmless falls on the government.  *Charley,* 189 F.3d at 1270 (citation omitted).

Cherosposy claims that Dr. Griest's testimony would have served to rebut the prosecution's allegations that the defendants' conduct in leaving Martinez in his car was wanton and reckless conduct that supported a finding of malice aforethought and allowed a verdict of second degree murder.  Appellant's Opening Brief at 18 (citing

*United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir.), *cert. denied,* 532 U.S. 1057 (2001)). The government's expert, Dr. Aronica-Pollak, testified that Martinez "could have had a chance to survive" if he had gotten immediate emergency medical attention." VIII R. 171. Cherosposy states that Dr. Griest "would have served to rebut these allegations," thus implying that Dr. Griest would have testified that Martinez would *not* have had a chance to survive. Appellant's Opening Brief at 18. Cherosposy argues that if the jury had accepted Dr. Griest's "testimony or found that the conflicting expert opinions meant the government failed in its burden of proof," he "could have been convicted of the less serious charge, voluntary manslaughter, and received a significantly lower sentence." *Id.*

However, Dr. Griest's testimony is a two-edged sword which could have as easily hurt Cherosposy as it might have benefitted him. On the one hand, Dr. Griest's testimony might[9] have led the jury to convict Cherosposy of voluntary manslaughter because the jury might have found the defendants' conduct in leaving Martinez was not wanton and reckless since Martinez would have died no matter what the defendants had done with him after the beating. On the other hand, the defendants' strategy in calling Dr. Griest was extremely risky. If Dr. Griest testified that the defendants beat Martinez so severely that he had no chance of survival, the jury would have had a basis for determining that the defendants' conduct in beating

---

[9] It should be noted that the record does not indicate what Dr. Griest would have specifically testified to as an expert witness.

Martinez was wanton and reckless and suggested a finding of malice aforethought, leading to a verdict of second degree murder.[10]  In sum, we believe that the district judge's error in excluding Dr. Griest's testimony was harmless.  *Kotteakos*, 328 U.S. at 764-65.

**B**

*Sentencing*

**1**

*Obstruction of justice*

Cherosposy states that the district court erred in imposing an adjustment for obstruction of justice based on a finding of perjury because there was no proof that his trial testimony was false and not the result of confusion, mistake, or faulty memory.  We disagree.

This court reviews the district court's legal interpretation of the Sentencing Guidelines *de novo*.  *United States v. Gardiner*, 931 F.2d 33, 34 (10th Cir. 1991). We review factual findings in support of an enhancement for obstruction of justice for clear error.  *See id.*

The district court must enhance a defendant's base offense level by two levels if it finds that:

---

[10] Dr. Griest's testimony would have added to the image of a severe beating that had already been created by Dr. Aronica-Pollak's description of Martinez's cause of death being "blunt trauma to the head, the neck, the chest and the abdomen."  VIII R. 173.

> [T]he defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct; . . .

U.S.S.G. § 3C1.1(A)-(B). A section 3C1.1 enhancement predicated upon perjury is appropriate when the sentencing court finds that the defendant has given "'[i] false testimony [ii] on a material matter [iii] with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *See United States v. Mounkes*, 204 F.3d 1024, 1029 (10th Cir.) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)), *cert. denied,* 530 U.S. 1230 (2000). "'Material' evidence . . ., as used in . . . section [3C1.1], means evidence . . . that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, comment. (n.6).

The mere fact that a defendant testifies to his innocence and is later found guilty does not automatically warrant a finding of perjury. *United States v. Markum*, 4 F.3d 891, 897 (10th Cir. 1993). To make a finding of perjury every time the defendant testifies and is convicted "would impinge upon the constitutional right to testify on one's own behalf." *Id.* Mere disagreement "between the defendant's testimony and the jury's verdict is insufficient to support a finding of perjury." *United States v. Weller*, 238 F.3d 1215, 1222 (10th Cir. 2001).

The sentencing court is required to "carefully review the evidence and make findings independent of the jury verdict which specifically identify the testimony at issue and establish that it, in fact, constitutes perjury." *Id*. The required findings must cover all the factual criteria of perjury. *United States v. Anderson*, 189 F.3d 1201, 1213 (10th Cir. 1999).

At sentencing, the trial judge explained his decision to grant the two-level enhancement for obstruction of justice as follows:

> A major issue in the case was whether the defendants had taken the victim to the place where he was found and left him without assistance to die. At the end of the government's case, I stated on the record, and I have not changed my mind, that there was adequate evidence that defendants knew or should have known that the deceased, the victim, had suffered life-threatening injuries and that without some medical care he would or could perish as a result of the injuries that he received.
>
> I cite just a few acts, and they are not intended to be all inclusive. He was gurgling. This sounds to me that it would at least lend the inference that the victim was choking on his own blood. His position, as shown by the photographs, is in a position that he wouldn't have chosen had he been getting into the car by himself. He was likely, from the position of the body in the vehicle, probably either unconscious or unable to move from the position where he was placed in the vehicle by one or more of the defendants. He was still mumbling or saying things that the defendants weren't quite clear about, yet those two defendants, Mr. Cherosposy and Mr. Manuelito, tried to convince the jury in court that this man didn't need to be carried and placed in the vehicle. He wouldn't have been able to get into that position, in my judgment, by himself. It appeared from the photographs as if they were disposing of a body in the back of the car, and he was gurgling, they said. Wouldn't that tell somebody that something serious was going on for Mr. Martinez? Yet they play it down as if he was just a happy-go-lucky drunk. Well, I conclude that they were lying about a very material aspect of the case. I adopt the conclusions made by the government on that issue.

XIII R. at 39-40 (transcript of 09/11/01 proceedings).

This court defers to the district court "when reviewing the credibility of the witness on whose testimony it relies in making its factual findings." *United States v. Nieto*, 60 F.3d 1464, 1469-70 (10th Cir. 1995), *cert. denied,* 516 U.S. 1081 (1996). The district court made every finding that is required by this court's case law: the testimony was false, it concerned a material matter, and it was willfully false. We hold that these findings are not clearly erroneous.

**2**

*Acceptance of Responsibility*

Cherosposy argues that the district court erred in denying a reduction for acceptance of responsibility because he admitted his culpability and guilt to an officer prior to trial, through his trial testimony, and to the probation officer during the presentence investigation. Appellant's Opening Brief at 23. We disagree.

This court reviews the district court's decision to deny an adjustment for acceptance of responsibility for clear error. *See United States v. Hawley,* 93 F.3d 682, 689 (10th Cir. 1996). The sentencing court's determination that a defendant is not entitled to an adjustment for acceptance of responsibility "is entitled to great deference on review," U.S.S.G. § 3E1.1, comment. (n.5), and should not be disturbed unless it is without foundation. *United States v. Lindsay,* 184 F.3d 1138, 1143 (10th Cir.), *cert. denied,* 528 U.S. 981 (1999).

A defendant is entitled to a reduction in offense level if he or she "clearly demonstrates acceptance of responsibility for his [or her] offense." U.S.S.G. § 3E1.1(a). A defendant who requires the government to prove his or her guilt at trial may qualify for acceptance of responsibility only in rare situations. *Id.* at comment. (n.2). A defendant has acted in a manner inconsistent with acceptance of responsibility adjustment if he or she "falsely denies . . . relevant conduct . . . ." *Id.* at comment. (n.1(a)). Although a defendant who is convicted at trial is not precluded automatically from receiving an acceptance of responsibility adjustment, a defendant who goes to trial only to require the government to prove his or her factual guilt generally would not be entitled to the adjustment. *Id.* at comment. (n.2). In addition, false testimony that results in an enhancement for obstruction of justice generally is inconsistent with an adjustment for acceptance of responsibility. *Id.* at comment. (n.4).

At sentencing, the trial court observed:

> With respect to the objections for the failure of the probation office to award two points for acceptance of responsibility, these young men didn't accept responsibility for this, not in the manner in which the Sentencing Guidelines intend that conclusion to be. They avoided responsibility, and even today their attorneys are attempting to place the responsibility from one to the other of the defendants. To hear counsels' (sic) explanations here today and the testimony here in this courtroom during the trial, you would think that poor Mr. Martinez had nothing more than a bloody nose. He was mercilessly beaten to death.
>
> I think it was the police chief at Laguna that had known this man since they went to school together, and he couldn't recognize him. Somebody did that, and there were three of them involved. For them to come in here today

and say, "Well, we didn't know he was hurt. We accept responsibility for giving him a bloody nose and accept responsibility for leaving him out in a place where it was unlikely he would ever be discovered, at least within a reasonable period of time,". . . left no question in my mind that they had not accepted responsibility and still haven't . . . .

XIII R. at 40-41 (Transcript of 09/11/01 proceedings).

As we discussed in the previous section of our opinion, we feel that the district judge was correct in finding that Cherosposy lied during the trial to attempt to negate the malice aforethought necessary to prove second degree murder. By lying in this way, Cherosposy forced the government to prove his guilt at trial. Forcing "the government to prove its case at trial," then expressing remorse does not constitute "a timely acceptance of responsibility." *United States v. Gallegos*, 129 F.3d 1140, 1147 (10th Cir. 1997).

This court should defer to the district court's determination concerning whether a defendant has made a timely acceptance of responsibility unless it is without foundation. *Lindsay*, 184 F.3d at 1143. The district court's denial of the reduction was "not clearly erroneous and is supported by the record." *United States v. Janusz*, 135 F.3d 1319, 1325 (10th Cir. 1998).

Accordingly, we affirm the judgment and sentence as to Cherosposy.

**IV**

*No. 01-2308: Mr. Sarracino's Appeal*

-44-

Mr. Sarracino raises a number of issues in his appeal, some of which have been raised by his co-defendants and some of which are raised only by him.

**A**

*Severance issues*

Like Mr. Manuelito, Mr. Sarracino argues that he should have been tried separately from the other defendants. The government contends that this issue has been waived. We find that it has not.

In a hearing on motions prior to trial, counsel for Mr. Sarracino indicated a desire for severance. The government responded by pointing out that no written motion had been filed on behalf of Sarracino. Although the record is less than clear, it appears that the trial judge treated counsel's remarks as an oral motion, without giving any indication that the failure to file a written motion had any bearing on his view of the issues. VI R. 4 (referring to motion for severance of "the defendants"), 30, 33.

We also note, as a preliminary matter, that because both of Mr. Sarracino's co-defendants testified at trial, his severance argument does not involve the holding of *Bruton v. United States*, 391 U.S. 123, as Mr. Manuelito's argument did. See n.4, *supra*. We also are mindful of the principle that "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *United States v. Zafiro*, 506 U.S. 534, 540 (1993).

Mr. Sarracino's argument is based largely on the assertion that this is a case of antagonistic defenses. But this is simply not so. Instead, the three defendants relied on the theory of self-defense. Sarracino also complains that evidence was admitted against him that would not have been admissible in a separate trial. As to the out-of-court statements of his co-defendants to the investigators, however, counsel for Sarracino at trial vigorously opposed any redactions to those statements on the ground that the theme of self-defense was consistent throughout. Moreover, the out-of-court statements of the co-defendants was mostly cumulative to their trial testimony, which would have been admissible against Sarracino in a separate trial. In view of these factors, plus the court's instruction to the jury not to consider the out-of court statements of any defendant in evaluating the case against any other defendant, we find there was no error in denial of the motion for severance.

Sarracino also argues that the evidence concerning his co-defendants leaving the victim at the old dump site as they did was unfairly prejudicial to him. We agree with counsel that, to a large extent, his argument in this regard is closely connected to his sufficiency of the evidence argument. For reasons discussed below in connection with that issue, we find no merit in the argument that Sarracino was unfairly prejudiced by this evidence, which we hold was properly admissible against him and would have been even had he been tried separately.

**B**

*Gruesome photographs of the victim*

This issue has been discussed above in the appeal of Mr. Manuelito, and no further discussion is necessary.

**C**

*Sufficiency of the evidence of murder in the second degree*

At the outset of this discussion, we note that Mr. Sarracino in the briefs also asserts that the trial court should have limited the instruction on second degree murder by specifying that the instruction was applicable only to the other defendants, not to Mr. Sarracino. That argument logically merges with the sufficiency of the evidence argument in our view.

Our discussion in Part II-A-4, *supra*, of the overall evidence in the case in connection with the harmless error analysis in Mr. Manuelito's appeal is fully applicable here, with the result that little more needs to be said. Mr. Sarracino's argument is implicitly based on the premises that he did not know that the victim was severely injured and in mortal danger and that he believed that Manuelito and Cherosposy were taking the victim home, where he presumably would have gotten any aid that he needed. But the evidence is easily susceptible to different interpretations, as we have already discussed. In particular, the co-defendants' testimony that they had intended to take the victim home only to change their minds

and decide to leave him at his own request was not likely to have been believed by the jury. The jury could well have decided that the victim was injured so badly, and his injuries so apparent, that the three defendants planned for Manuelito and Cherosposy to remove the victim from the immediate area and abandon him.

Mr. Sarracino's own statement to the investigator included incriminating details. Sarracino said that he and Manuelito were kicking the victim in the struggle over the gun, "and when and then [sic] we were successful [,] we were kicking him during [sic] trying to get it away to [sic] *and after*." Gov. Exhibit 18(a) at 3 (transcript of interview of Sarracino) (emphasis added). He said that they had kicked the victim in the body and in the head, and that he did not remember how many times they had kicked him. As discussed *supra*, Sarracino said that the victim afterwards was making a "gargling" noise. Asked if he thought that the victim was hurt at that point, Sarracino said: "Yes, I knew he was hurt and I was glad that he was hurt because he was pointing the gum [sic] and threatening to kill us and what else were we suppose to do but get the gun away . . . ." *Id.* at 5.

The severity of the beating inflicted on the victim, as described by Dr. Aronica-Pollak, and the totality of the other evidence, including Mr. Sarracino's out-of-court statement to the investigator, were sufficient to establish the element of malice. We conclude that the evidence was sufficient to support the conviction of murder in the second degree.

## D

### *Vindictive prosecution*

Sarracino claims that vindictive prosecution occurred when, after he refused to accept the final plea proposal to a manslaughter indictment, the prosecution obtained a superseding indictment for second degree murder. We disagree.

On appeal, Sarracino raises five alleged misrepresentations by the testifying case agent to the grand jury in support of the superseding indictment which Sarracino contends reveal vindictive prosecution. Appellant's Initial Brief at 29. However, since Sarracino did not raise these issues below, we will not review them. *King v. United States,* 301 F.3d 1270, 1274 (10th Cir. 2002) (holding that it is a general rule that this court will not review issues that were not raised below). Instead, we will only review the issues Sarracino[11] raised in Defendants' Motion to Dismiss Superseding Indictment.

In the Motion to Dismiss, Sarracino stated that under the initial indictment a grand jury indicted him for voluntary manslaughter, but after the government presented the same grand jury with the superseding indictment, he was indicted for second-degree murder. He then raised the following issues. First, the same grand

---

[11] Sarracino and Cherosposy submitted a joint motion. However, this court only refers to Sarracino when discussing this motion because only Sarracino raised the issue of vindictive prosecution on appeal.

jury heard both prosecutorial presentations. Second, no identifiable new evidence was presented to the later grand jury that was not already known and presented to the first grand jury. Third, no evidence was discovered for the presentation to the second grand jury that was not available to the first grand jury. Fourth, the superseding indictment was sought primarily to up the ante and force the defendants to accept the prosecution's plea proposal. Finally, Sarracino asserted that the "motive for the presentation of additional charges indicates a *prima facie* evidence [sic] and a reasonable likelihood of vindictive prosecution, justifies further discovery on this subject, and, if sufficient evidence is adduced, warrants dismissal of the Superseding Indictment." I R. (Doc. 102).

The district judge addressed these issues in his Memorandum Opinion and Order denying the defendants' motion to dismiss the superseding indictment. I R. (Doc. 134). The judge held that "the facts of this case appear to fall four-square within *Bordenkircher v. Hayes,* 434 U.S. 357 (1978); *see also United States v. Goodwin*, 457 U.S. 368 (1982)." I R. (Doc. 134). Not only is a presumption of vindictiveness inapplicable to the "give-and-take" of plea negotiations, but even a showing of actual vindictiveness does not necessarily warrant dismissal of the indictment. *Id.* The judge stated that in "*Bordenkircher* the prosecutor's threats did not establish improper motive: prosecutors enjoy broad discretion to select the charges against an accused, and '[a] charging decision does not levy an improper

"penalty" unless it results solely from the defendant's exercise of a protected legal right, rather than the prosecutor's normal assessment of the societal interest in prosecution.'" I R. (Doc. 134) (citing *Goodwin*, 457 U.S. at 380, nn.11, 12). Thus, "'[a]n initial decision should not freeze future conduct[;] the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution.'" I R. (Doc. 134) (citing *Goodwin*, 457 U.S. at 383). Furthermore, the judge continued, it is not clear that defendants even have identified a protected right against which the government could have retaliated. I R. (Doc. 134). "Under either indictment, they are entitled to and will receive a trial by jury." *Id. Cf. United States v. Wall*, 37 F.3d 1443, 1449 (10th Cir. 1994).

This court reviews the district court's factual findings on prosecutorial vindictiveness for clear error, and reviews *de novo* its legal conclusions. *United States v. Wall*, 37 F.3d 1443, 1448 (10th Cir. 1994). To prove prosecutorial vindictiveness, the defendant must prove either (1) "actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness." *United States v. Lampley,* 127 F.3d 1231, 1245 (10th Cir. 1997), *cert. denied,* 522 U.S. 1137 (1998). If the defendant proves either element, the burden shifts to the government to justify its prosecutorial decision based on "legitimate, articulable, objective reasons." *United States v. Raymer*, 941 F.2d 1031, 1040 (10th Cir. 1991). If the defendant fails to prove either element, the trial court

need not address the government's justification for its prosecutorial decision. *Id.* Merely by the appearance of vindictive motives, vindictiveness may not be presumed. *Bordenkircher v. United States*, 434 U.S. 357 (1978); *United States v. Goodwin*, 457 U.S. 368 (1982).

In determining whether the government has engaged in prosecutorial vindictiveness, this court must determine whether the prosecution engaged in conduct that would not have occurred but for the prosecution's desire to punish the defendant for exercising a specific legal right. *United States v. Contreras*, 108 F.3d 1255, 1262 (10th Cir.), *cert. denied,* 522 U.S. 839 (1997). However, the Supreme Court has held that a prosecutor may threaten to charge a greater offense if a defendant will not plead guilty to a lesser one, as long as the prosecutor has probable cause to believe that the defendant committed the greater offense. *Bordenkircher,* 434 U.S. 357.

On appeal, Sarracino reiterates his trial court argument that the government, when unable to reach a plea agreement, may not create new charges on the same evidence in order to punish the exercise of his Constitutional right to proceed to trial.[12]   Appellant's Initial Brief at 27.   He also adds the new argument that

_____

[12] Sarracino states that every plea proposal the government offered him recognized that he had a lesser role in Martinez's death and thus each proposed lesser penal consequences for him than for his co-defendants. Appellant's Initial Brief at 26-27. He contends that he did not accept a 5K plea proposal because the government requested testimony from him that would have to have been "either untrue or require him to testify to events he could not have observed because he was behind the house disposing of Martinez's weapon when the critical events

(continued...)

presenting misleading evidence to the grand jury is further evidence of vindictive prosecution. *Id.*

We hold that the district judge properly determined that the government did not engage in prosecutorial vindictiveness, and we uphold its judgment. The government's initial decision to charge voluntary manslaughter did not limit the government's ability to seek a superseding indictment charging second degree murder. *Goodwin*, 457 U.S. at 382 (holding that an initial decision should not freeze future conduct and that the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution). We agree with the district judge that the government did not engage in vindictive prosecution. I R. (Doc. 134).

Further, we agree with the trial court that it is not clear that Sarracino satisfied the vindictive prosecution threshold issue of identifying "a protected right against which the government could have retaliated." I R. (Doc. 134). The Supreme Court has held that so long as the prosecutor has "probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher,* 434 U.S. at 364. However, the decision

[12](...continued)
actually occurred." Appellant's Reply Brief at 15. This unwillingness to lie, Sarracino claims, left him no choice but to go to trial, which was his constitutional right.

to prosecute may not be intentionally based upon an improper criterion such as race or religion, nor on the exercise of protected statutory and constitutional rights. *Wayte v. United States*, 470 U.S. 598, 608 (1985).

Sarracino claims that the government punished him for exercising his constitutional right to have a trial rather than accept a plea bargain. Appellant's Initial Brief at 27. Sarracino made the tactical choice to reject the plea bargain and proceed to trial. *See United States v. Wall*, 37 F.3d 1443, 1449 (10th Cir. 1994) (holding that a tactical decision to seek partial severance of charges cannot permit charge of vindictiveness when government subsequently files superseding indictments in later trials). The government had probable cause to seek the reindictment of Sarracino for second degree murder based on the facts discussed earlier in this opinion and did so. *Bordenkircher,* 434 U.S. at 364. Sarracino has to live with the consequences of his tactical choice. "A claim of vindictive prosecution cannot insulate the defendant from the lawful consequences of his tactical choices." *United States v. Raymer,* 941 F.2d 1031, 1042 (10th Cir. 1991).

In sum, because Sarracino cannot satisfy the threshold issue of showing that the government violated one of his protected rights, we hold that he has not carried his burden of proving actual vindictiveness or a realistic likelihood of vindictiveness. Additionally, Sarracino's inability to shoulder this burden means that we do not need

to reach his claim that the government's presentation of allegedly misleading evidence in its superseding indictment is further evidence of vindictive prosecution.

**E**

*Cumulative error*

This issue has been discussed above in section II, D, the appeal of Mr. Manuelito, and so we will not restate this court's process of determining cumulative error, *United States v. Rivera*, 900 F.2d at 1470, and will instead only focus on the grounds raised by Sarracino.

Since we have not found any errors in the issues Sarracino has raised in the rest of his brief, we now turn to the five additional purported errors Sarracino raises in the cumulative error section of his brief: restricting the cross-examination of Claudia Martinez; restricting the cross-examination of Investigator Laducer; referring to the "United States" as the party the prosecutors represent; showing admitted evidence to Ms. Martinez which upset her; and questioning the forensic pathologist regarding whether Mr. Martinez's lip was ripped from his gum.

First, we have held that the trial judge impinged on the defendants' right of confrontation by completely excluding any inquiry into the reasons for Mr. Laducer's having left his employment with the BIA. See Part II-B, *supra*. We have also held, however, that this error was harmless beyond a reasonable doubt. *Id.*

Second, we hold that the trial judge did not violate Sarracino's right of confrontation by properly restricting the cross-examination of Ms. Martinez from exploring irrelevant personal issues. *See Delaware v. Fensterer,* 474 U.S. 15, 20 (1985) (*per curiam*) (holding that the confrontation clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.") (emphasis in original); *see also Matthews v. Price,* 83 F.3d 328, 333 (10th Cir. 1996).

Third, the prosecutors' statements that they represent the United States is correct and a familiar expression and therefore was not an error. It should be noted that Mr. Sarracino did not object to these references. *See, e.g.,* XI R. 1058 (Transcript of government's argument) ("[w]e are proud to represent the United States").

Fourth, the government's display of Mr. Martinez's clothing, which had been admitted in evidence, to Ms. Martinez was not error because the government was required to prove that the items belonged to Mr. Martinez. The defendants stipulated to this connection after Ms. Martinez's emotional outburst. X R. 589 (Transcript of 11/14/00 proceedings) ("[t]he parties have reached a stipulation that the 'Number One Dad' tag . . . . the glasses frame and two lenses . . . and the Nobel Sysco jacket . . . were all owned by Raynard Martinez.").

Finally, the prosecutor's question to the forensic pathologist regarding whether Martinez's lip had been ripped away from his gum was a fair characterization, in lay terms, of the pathologist's testimony. VIII R. 133-34 (Transcript of 11/9/00 proceedings) ("'Q. So his lip is ripped from his gums?' . . . 'A. That little area that connects them was torn.'"). None of the defendants objected to this question, VIII R. 133-34, and the district judge instructed the jury that the statements and argument of counsel were not evidence. XI R. 982 (Transcript of 11/15/00 proceedings) ("Remember these statements are not evidence, and what the lawyers say is not binding upon you.").

Because we find only one error in Mr. Sarracino's trial, which was harmless beyond a reasonable doubt, we need not conduct cumulative error analysis.

**F**

*Sentencing issues*

**1**

*Acceptance of Responsibility*

The district judge properly determined that Sarracino did not qualify for an adjustment for acceptance of responsibility because his claim of self-defense and his refusal to take full responsibility for the offense of which he was convicted forced the government to prove his factual guilt at trial. Because we discussed an almost

identical issue extensively above in the appeal of Mr. Cherosposy, we feel that no further discussion is necessary.

## 2

*Sarracino's motion for downward departure*

This court lacks jurisdiction to review the district court's denial of Sarracino's motion for downward departure. Issues of jurisdiction are questions of law subject to *de novo* review. *See United States v. Delatorre*, 157 F.3d 1205, 1208 (10th Cir. 1998), *cert. denied,* 525 U.S. 1180 (1999).

This court has jurisdiction to review a sentence (1) "imposed in violation of law"; (2) "imposed as a result of an incorrect application of the sentencing guidelines"; (3) imposed as a result of the granting of a motion for upward departure, or (4) "imposed for an offense for which there is no sentencing guideline and [which] is plainly unreasonable." 18 U.S.C. § 3742(a). This court does not have jurisdiction to review sentences that do not fall into one of these categories. Therefore, this court does not have jurisdiction to review the district judge's discretionary decision to deny a motion for downward departure on the ground that a defendant's specific circumstances do not warrant a departure. *See United States v. Castillo*, 140 F.3d 874, 887 (10th Cir. 1998). This court only has jurisdiction to review the district judge's denial of a downward departure in the rare instance when a district judge concluded that he did "not have any authority to depart from the

sentencing guideline range for the entire class of circumstances proffered by the defendant." *Id.; see also United States v. Fortier*, 180 F.3d 1217, 1231 (10th Cir. 1999) (citing nine Tenth Circuit cases decided in each year from 1990 to 1998 which each state the same rule).

The trial judge's comments at sentencing make clear that he was cognizant of his authority to depart and decided not to do so.[13]  *See Castillo,* 140 F.3d at 887.  In sum, this court is without jurisdiction to consider this issue on appeal.  *See id.*

---

[13] At sentencing, the trial judge responded in the following way to Sarracino's request for a downward departure pursuant to USSG § 5K2.10 on the theory that Martinez provoked the altercation that caused his death:

> There was also an objection that the probation office had not reduced the guideline sentence for the actions of Mr. Martinez.  Mr. Martinez, they claim, was responsible for the altercation. That's what they say.  There is no one here other than these defendants that say that. There is a significant difference in them saying that and it being so, especially when it's to their benefit to do so, to say so.
>
> I have very great difficulty accepting that Mr. Martinez, who had, for all objective evidence, two bottles of beer before he arrived at the scene – and one of the defendants having six.  I don't know about the second, but it was nearly unbelievable to me that Mr. Martinez would start a fight with three people even if he had a gun. It may be something different than what the Court heard as to how this fight started.  There is no corroboration to the statements made by the defendants about how this occurred.
>
> To reduce the sentences for three persons who engaged in a battle with one person, which left him dead and didn't leave a mark on any one of these three defendants, all very young, strong athletic men and say, "Oh, it was all his fault.  After we battled with him for such a long time and finally wrestled the weapon from him, he was in such bad condition that we had to help him into the car," to give a reduction of sentence for the actions of the victim under such circumstances makes no sense.  And the jury agreed that the defendants went afar in their reaction to whatever the defendant did, if he did anything, so I will not depart downward on that.

XIII R. 41-42 (Transcript of 09/11/01 proceedings).

# V

## *Conclusion*

For the reasons given, the convictions and sentences of all three appellants are

**AFFIRMED.**