*21 KAREN LECRAFT HENDERSON, Circuit Judge,
concurring in part and dissenting in part:
My colleagues reverse Rico Williams’s murder conviction because of eleven words the prosecutor uttered in her rebuttal closing argument. 'In their view, the prosecutor’s statement was legally incorrect and Williams was substantially prejudiced because the district court failed to cure the error and because the evidence was close. I disagree with each component of that analysis. The prosecutor misstated nothing. The district court’s charge was correct and balanced. And the evidence of guilt was powerful. Because Williams received a trial that was error-free — and at all events fair — I would affirm his second-degree murder conviction.[1]
I. The Beating and the Aftermath
On the night of July 3, 2005, in a brick-floored hut in Hohenecken, Germany, gang leader Williams and his fellow gang members beat Army Sergeant Juwan “Jay” Johnson to death during a gang-initiation ritual. Williams, at 6’2” or 6’3”, began the so-called “jump-in” with a punch directly to Johnson’s face. Johnson, at 5’2” or 5’3”, hit the floor. He got back up. Williams hit him in the face again. The other eight gang members then joined the fray, pummeling Johnson. During the course of more than six minutes of a nine-man beating, Johnson fell to the ground, curling up into the fetal position. Williams then led the group in what one witness described at trial as “stomp[ing] on” Johnson. Trial Tr. 30 (Oct. 25, 2010).
Johnson emerged from the ordeal alive but was walking as if intoxicated. He slurred his speech. He had soiled himself. It took four men to carry him up the stairs to his barracks. Once there, Johnson, with assistance, eventually took a shower and spoke with his wife on the telephone. He then asked to be taken to the hospital. Florentino Charris, the gang member Williams assigned to watch Johnson, spoke with another gang member who relayed Johnson’s request to Williams. Williams directed that Johnson not be taken to the hospital. Charris eventually fell asleep. When he awoke a couple of hours later, Johnson was dead.
The day after the beating, July 4, Williams concocted a cover story and disseminated it among his fellow gang members. He took the gang’s stash of cash' — ■ about $600 in “dues” that had been collected from the gang members — explaining to the gang treasurer that “if anybody was going to come for anybody first, they were going to come for him,- and he needed [the money] to get out of the country.” Trial Tr. 44 (Oct. 29, 2010). On July 6, Williams caught a flight out of Germany back to the United States. He remained at large until his arrest nearly four years later. After a three-week trial, a jury convicted Williams of second-degree murder for his role in Johnson’s death.
II. The Standard of Review
As the majority tells it, reversal is necessary to undo a prosecutorial misstatement about “consent,” Maj. Op. 12-15, which the district court failed to correct, Maj. Op. 16. Williams frames the issue differently, claiming that “the district court improperly foreclosed [his] closing argument and improperly denied [his] re *22 quested language on consent.” Appellant’s Br. 62 (capitalization altered). I highlight the distinction at the threshold because the law governing alleged prosecutorial misconduct is different from the law governing a challenge to the jury charge.
The test for misconduct recognizes that “a prosecutor’s statements in closing argument will rarely warrant a new trial” if he misstates the evidence. United States v. Watson, 171 F.3d 695, 699 (D.C. Cir. 1999). The same is true if the prosecutor allegedly misstates the law because an advocate’s declarations — “usually billed in advance to the jury as matters of argument” — “are not to be judged as having the same force as an instruction from the court.” Boyde v. California, 494 U.S. 370, 384-85, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); see United States v. Venable, 269 F.3d 1086, 1091 (D.C. Cir. 2001) (prosecutorial misstatement of law can be “mitigated” by correct jury instructions, especially if court instructs “that it [is] the court’s responsibility to apprise the jury as to the law, and that the lawyers’ statements [are] merely argument”). Ultimately, the inquiry turns on whether a misstatement occurred and caused “substantial prejudice” to the defense. United States v. Straker, 800 F.3d 570, 628 (D.C. Cir. 2015) (per curiam).
By contrast, when the jury charge is challenged, we consider “whether, taken as a whole, [the instructions] accurately state the governing law and provide the jury with sufficient understanding of the issues and applicable standards.” United States v. Wilson, 605 F.3d 985, 1018 (D.C. Cir. 2010) (per curiam) (internal quotations omitted) (alteration in original); see Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 556 (D.C. Cir. 1993) (we review de novo “[a]n alleged failure to submit a proper jury instruction”).
III. The Prosecutor Did Not Misstate the Law
Whether the alleged error sounds in misconduct or instructional error or both, it cannot support reversal in light of the district court’s correct and careful charge. See infra Point IV.A. For starters, however, I cannot discern a prosecutorial misstatement.

A. The Context of the Statement

As the majority notes, “ ‘[c]ontext is key,’ ” Maj. Op. 14 (quoting Venable, 269 F.3d at 1090), and so it is worth recounting the procedural backdrop against which the prosecutor spoke.
Before trial, the parties jointly proposed a jury instruction stating in part that “under no circumstance is consent a defense to the crime of homicide.” Proposed Jury Instructions at 46, Dkt. 96. That language is consistent with settled law. See, e.g., Washington v. Glucksberg, 521 U.S. 702, 714, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (“the well-established common-law view” was “that the consent of a homicide victim is wholly immaterial to the guilt of the person who caused his death”) (quotation and alterations omitted); Woods v. United States, 65 A.3d 667, 672 (D.C. 2013) (“[C]onsent is not a defense to a charge of assault with significant bodily injury arising out of a street fight.”); Durr v. State, 722 So.2d 134, 135 (Miss. 1998) (victim’s consent was no defense to manslaughter charge against defendant who killed fellow inmate in gang-initiation beating); State v. Hiott, 97 Wash.App. 825, 987 P.2d 135, 136-37 (1999) (“[C]onsent is not a valid defense if the activity consented to is against public policy. Thus, ... a gang member cannot consent to an initiation beating....”) (citation omitted).
During the trial, the government itself elicited testimony about Johnson’s “consenting behavior” — to use the majority’s *23 term, e.g., Maj. Op. 15 — and it did not object, on relevance grounds or otherwise, to the defense’s introduction of evidence on the same point. At the charge conference, the defense revisited the joint instruction that consent is not a defense. Pointing out that “it’s pretty much undisputed that Sergeant Johnson consented to the jump-in,” the defense argued that Johnson’s consent “undermine[d]” Williams’s criminal intent. Trial Tr. 56 (Nov. 5, 2010). The defense therefore urged the district court to amend the joint instruction to say that “you may consider ... consent in determining whether the defendant had the necessary malice aforethought to establish the crime of second-degree murder.” Id. at 57. The court denied the request because “intent and mens rea are adequately defined in the substantive instructions” and, in any event, “to tell [the jurors] that they can consider consent as it relates to intent or mens rea is not a fair statement of the law.” Trial Tr. 24 (Nov. 8, 2010).
In closing argument, before the jury was charged, the defense strayed from the district court’s ruling. It argued not just that Johnson’s “saying ... yes, yes, yes” during the jump-in could “affect the state of mind of the person who supposedly murdered him.” Trial Tr. 32 (Nov. 8, 2010). That statement would have been unobjectionable if tied solely to Williams’s appreciation of Johnson’s condition at that point. But the defense also argued, incorrectly, that Johnson’s “consent” could negate Williams’s criminal intent:
[T]he Judge is going to tell you that consent is not a defense, and we understand that, but it [ie., consent] has to factor in ... to whether Mr. Williams, [as] the government claims, intended to kill Sergeant Johnson and intended to seriously injure Sergeant Johnson, and had a reckless disregard for his life or serious injury.
Id. (emphases added). In rebuttal, the prosecutor responded as follows:
[Defense counsel] gave you some incorrect law because the judge is the one— he’s the final' — -he is the expert on the law, the judge. And you can’t take— Sergeant Johnson went in there thinking that he was going to become a member of a brotherhood. He did not go in there willingly to get killed because consent is never ever a defense to murder. It is no defense to second degree murder or involuntary manslaughter, and, you know what, the judge is going to tell you— [defense counsel] told you to consider it; don’t even consider it because you can’t consider it. It is not a defense.
[U]nder no circumstances is consent a defense to the crime of homicide. So remember that. You can’t even consider it in his intent or anything else. You just cannot.
Id. at 100-01 (emphasis added).
B. The Prosecutor Was Right that Johnson’s Consent Was Irrelevant
My colleagues conclude that the comment italicized above misstated the law and “suggested to the jury that it could not consider [Johnson’s] behavior” — namely, his “ ‘yeses’ ” during the jump-in — “for any purpose.” Maj. Op. 14. I disagree. The prosecutor did not tell the jurors that they could not consider Johnson’s “behavior” or his “yeses.” She said they could not consider his consent. As the majority appears to acknowledge, Maj. Op. 16-17 those are two different things. Consent is an individual’s subjective willingness, sometimes manifested by behavior or words, that some act or event occur. See, e.g., Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 449 (D.C. Cir. 1965) (distinguishing, in contractual context, between subjective con *24 sent and “an objective manifestation of’ it); Restatement (Seoond) of ToRts § 892(1) (1979) (“Consent is willingness in fact for conduct to occur. It may be manifested by action or inaction and need not be communicated to the actor.”). If in fact consent were necessarily synonymous with behavior or words, it would be difficult to reconcile with the incapacity doctrine, under which the law presumes that children, intoxicated persons and the insane are deemed incapable of consent even if they “profess[]” it. Dan B. Dobbs et al., The Law of ToRts § 109 (2d ed. June 2016) (“professed consent” does not “bar [a tort] claim if the plaintiff lacked capacity to give consent”).
Given the distinction between subjective consent and physical or verbal manifestations of it, the prosecutor’s rebuttal argument was correct. Whether Williams had the mens rea for second-degree murder turned on whether he acted “recklessly, in conscious disregard of an extreme risk of death or sérious bodily injury to” Johnson. Trial Tr. 39 (Nov. 9, 2010) (jury instructions). Johnson’s consent — his state of mind — had nothing to do with Williams’s perception of risk. Cf. United States v. Mi Sun Cho, 713 F.3d 716, 721-22 (2d Cir. 2013) (per curiam) (in sex-trafficking case, victim’s “subjective willingness to travel” was wholly “immaterial to the charges” because it went “to the irrelevant issue of her consent”); People v. Mangiaracina, 98 Ill.App.3d 606, 54 Ill.Dec. 110, 424 N.E.2d 860, 863 (1981) (“[Wjhether the [rape] victim did, in fact, consent ... involves her mental state, not the defendant’s.”). The counterfactual the majority posits, Maj. Op. 14, only illustrates the point. If Johnson had said “no” or “stop,” that would indeed be relevant evidence. But the reason it would be relevant has nothing to do with consent. See Glucksberg, 521 U.S. at 714, 117 S.Ct. 2258. Instead, the reason words like “no” or “stop” would be relevant is that they would tend to show that Johnson sensed danger and communicated that to Williams, who would then either (1) cease because of an extreme risk of death or serious bodily injury to Johnson or (2) continue beating Johnson in conscious disregard of that risk.
Consider a hypothetical that even more plainly demonstrates why consent, qua consent, had nothing to do with Williams’s state of mind. Suppose a gang recruit said during a jump-in: “I can’t breathe. I feel dizzy. But I still want in. Just get it done.” The last two statements would manifest consent but they would be irrelevant to the attacker’s intent, especially in light of the statements “I can’t breathe” and “I feel dizzy.” That is because words of consent are relevant only if they tend to show that the attacker did not know that the victim was in danger. And statements like “I can’t breathe” and “I feel dizzy” would show beyond doubt that the victim was indeed in danger.
As the majority recounts, Maj. Op. 4-5, Johnson said “ ‘Hell yeah,’ ” . or words to that effect, when asked whether he wanted the jump-in to continue. I do not dispute, as a matter of relevance, that “Johnson’s repeated insistence that he wanted the jump-in to continue might have signaled to Williams that Johnson was in no serious danger.”[2] Maj. Op. 14. Crucially, however, the prosecutor never said otherwise. Instead, she told the jurors that Johnson’s “consent” was irrelevant. That was an accurate statement of law. If Johnson had cried out “Kill me,” would it be proper for any defense counsel to argue, or any judge to instruct, that the jury could consider that as exculpatory evidence? Of course not. The problem in this case has been the *25 defense’s insistence — during its closing argument and now on appeal — on using “consent” to describe Johnson’s physical condition as communicated by Johnson’s words. And the prosecutor’s reference to “consent” in rebuttal was an understandable effort to correct the defense’s misuse of the word.
In any event, and contrary to the majority’s recounting, the prosecutor did not say that the jury “could not consider [Johnson’s] behavior for any purpose.” Maj. Op. 14 (emphasis added). Nor would a reasonable jury have understood her to make such an argument in light of the government’s having first elicited testimony about Johnson’s behavior during the jump-in and not objecting when the defense presented similar evidence.
IV. Williams Suffered No Prejudice
Nevertheless, the majority worries that the prosecutor misled the jurors into categorically disregarding Johnson’s purported “consenting behavior,” Maj. Op. 15, so that they convicted Williams of second-degree murder when they might otherwise have convicted him of manslaughter, Maj. Op. 15-16. I would not share its concern even if I thought the prosecutor had misspoken. The district court thoroughly apprised the jurors of the relevant law. Moreover, when measuring the strong mens rea evidence under that error-free jury charge, I am confident that a reasonable jury would have convicted Williams of second-degree murder had the prosecutor said nothing about the relevance vel non of Johnson’s purported consent. Accordingly, “when all is said and done,” any prosecutorial misstatement either “did not influence the jury, or had but very slight effect.” Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

A. The Jury Charge Cured Any Misstatement

After the prosecutor’s alleged misstatement, the defense objected at sidebar. Trial Tr. 124 (Nov. 8, 2010). It later proposed a curative instruction that would have said in part:
[Ujnder the law, you may consider Ju-wan Johnson’s consent to the initiation, among all the other evidence I have admitted, in determining whether the government has proven Mr. Williams’ intent to commit the crimes of second degree murder or involuntary manslaughter beyond a reasonable doubt.
Mr. Rico Williams’ Objection to Government’s Improper Closing Argument and Motion for Curative Instruction at 4, Dkt. No. 125 (emphasis added). The district court declined to give the proposed instruction, see Trial Tr. 12-13 (Nov. 9, 2010), relying in part on its earlier ruling that “to tell [the jurors] that they can consider consent as it relates to intent or mens rea is not a fair statement of the law,” Trial Tr. 24 ■ (Nov. 8, 2010). The court’s explanation bears lengthy reproduction:
Now, I then went on to say last week ... why I was not going to include [defense counsel’s] proposed addition to the consent-is-not-a-defense instruction. Because his instruction, his proposed instruction or proposed addition, essentially said: Well, it’s not a defense, but consent is relevant to mens rea or intent. And I said I wasn’t going to give the instruction, and I said the reason I wasn’t going to give the instruction was because they’re two separate matters, and I’m already discussing mens rea and intent in each of the separate instructions on the underlying offenses.
And I’m not going to give a curative instruction because I think by giving a *26 curative instruction, it undermines my rulings. And I didn’t tell the jury to strike and disregard [the defense’s] argument [about Williams’s intent]; [the prosecutor] is not the judge, and in her rebuttal argument she made the point that that argument was inconsistent with an instruction they are going to hear.
But what I’m going to tell them this morning is, without giving a curative instruction, without highlighting what [the defense] said and without highlighting what [the prosecutor] said in their closing arguments, that they need to consider all of the instructions together and not take any one instruction out of context or highlight it to the exclusion of others. I think that’s part of the standard instructions.
Trial Tr. 12-13 (Nov. 9, 2010).
In short, the district court declined to give the defense’s curative instruction because it was wrong, just as the defense’s proposed addition to the consent instruction had been wrong. For reasons I have explained, Johnson’s subjective consent was not itself relevant to Williams’s state of mind. The curative instruction would have said the opposite. The court therefore correctly declined to give it. 1 Kevin F. O’Malley et al., Federal JüRY PRACTICE and InstructioNS § 7:3, at 743-44 & nn.ll-12 (6th ed. 2006) (“Requested instructions must be accurate or the court is under no obligation to give them.”) (citing cases).
Recognizing that the defense “might have been better served to use a term such as ‘consenting behavior’ instead of ‘consent,’” Maj. Op. 16, my colleagues fault the district court for failing to “rephrase[ ] the instruction to refer more directly to Johnson’s statements and behavior,” Maj. Op. 17. The court had no duty to fashion a suitable cure for a non-existent ill. And it certainly did not have to focus the jury’s attention on Johnson’s words in order to forestall prejudice from any prosecutorial misstatement.
A district judge has wide discretion in how he phrases his instructions, Joy, 999 F.2d at 556, and in how he remedies perceived trial errors, United States v. Foster, 557 F.3d 650, 654-55 (D.C. Cir. 2009). He may comment on the evidence but he must “use great care” not to “be one-sided” because “his lightest word or intimation is received with deference, and may prove controlling” in the jurors’ minds. Quercia v. United States, 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321 (1933) (internal quotations omitted). Unsurprisingly, then, other courts of appeals have cautioned against including factual commentary in jury instructions. See, e.g., United States v. Bowen, 437 F.3d 1009, 1018 (10th Cir. 2006) (“[T]he district court must exercise care when, including illustrative examples of [a criminal element] in an instruction. ...”); Hardin v. Ski Venture, Inc., 50 F.3d 1291, 1294 (4th Cir. 1995) (“A court is not required to comment on specific evidence in the course of giving a jury instruction, and indeed often is well-advised not to.”).
Here, the district court prudently declined to “highlight! ]” that Johnson’s words could have led Williams to believe that Johnson wanted his beating to continue. Trial Tr. 13 (Nov. 9, 2010). If the court had singled out that evidence, evenhand-edness would have required recitation of evidence favorable to the government, including that Williams led his fellow gang members in stomping on Johnson and that he denied Johnson’s request to be taken to the hospital. Starr v. United States, 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841 (1894) (agreeing with Pennsylvania Supreme Court that judicial commentary on evidence, “if stated at all,” should include both “that which makes in favor of a party [and] that which makes against him”) (internal quotation omitted); cf. Duke v. Uni *27 royal Inc., 928 F.2d 1413, 1421 (4th Cir. 1991) (“refusal to single out any particülar item of evidence” in jury instructions “is often a sensible approach to evenhandedness in the presentation of the law”).
In any event, the district court’s rejection of the defense’s curative instruction “may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.” Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (internal quotation omitted); see Henderson v. Kibbe, 431 U.S. 145, 152 n.10, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). There is no cause for reversal if the instruction the defense sought “was substantially covered in the charge actually delivered to the jury.” United States v. Udo, 795 F.3d 24, 29 (D.C. Cir. 2015) (internal quotation omitted). That was the case here; several features of the jury charge ensured that the prosecutor’s statement, even if erroneous, did not prejudice Williams.
First, the district court told the jurors that “it’s your sworn duty to base your verdict on the law that I give you in these instructions and on the evidence that has been admitted in trial.” Trial Tr. 21 (Nov. 9, 2010) (emphasis added). In the same vein, the court instructed:
[B]oth lawyers made reference to portions of these instructions yesterday during closing arguments, and we may have even made some minor wording changes since then, but I need to tell you that it is your duty to accept the law as I instruct you on the law, and you should consider all of the instructions as a whole.
Id. (emphasis added). The jury is presumed to have adhered to that directive. See Richardson v. Marsh, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).
The majority concludes otherwise, theorizing that juries generally give “particular weight” to prosecutorial statements of law because they come “ ‘wrapped in the cloak of state authority.’ ” Maj. Op. 15 (quoting Spivey v. Head, 207 F.3d 1263, 1275 (11th Cir. 2000)). Even assuming such a phenomenon exists, it has no application here. The prosecutor herself told the jury, immediately before commenting on the law of consent, that “the judge is the one — he’s the final — he is the expert on the law.” Trial Tr. 100 (Nov. 8, 2010). That remark sent the jurors right back to the instructions, which did not then lead them astray. See United States v. Hall, 610 F.3d 727, 743 (D.C. Cir. 2010) (district court’s charge cured prosecutor’s misstatement of law, “particularly when the erroneous argument was acknowledged by the prosecutor to be subject to the court’s instructions”).
Second, the district court instructed the jurors to “[d]ecide the case solely from a fair consideration of all of the evidence” and that “you alone decide what weight, if any, to give to the evidence that’s been admitted.” Trial Tr. 22 (Nov. 9, 2010); see id. at 28 (court also told them “you should consider all of the evidence presented, both direct and circumstantial”). As discussed, “the evidence ... admitted” included Johnson’s words during the jump-in. Accordingly, a reasonable jury would understand that it “should consider” Johnson’s words and give them whatever weight it thought they warranted. And a reasonable jury would have similarly understood from the court’s decision to let stand the defense’s closing argument that Johnson “kept saying the same thing over and over and over and over, yes, I want this” that it should consider those words. Trial Tr. 32 (Nov. 8, 2010); cf. Boyde, 494 U.S. at 383, 110 S.Ct. 1190 (rejecting claim that court and prosecutor misstated what mitigating evidence could be considered during capital sentencing proceedings, in part because “the context of the proceedings would have led reasonable jurors to *28 believe that [the] evidence [at issue] could be considered”).
Third, the district court explained in detail the mens rea necessary to support a second-degree murder conviction. Specifically, the court instructed:
To kill with malice aforethought means to kill either deliberately and intentionally, or recklessly, in conscious disregard of an extreme risk of death or serious bodily injury to Juwan Johnson. To find that the defendant acted with malice aforethought, the government must prove beyond a reasonable doubt that the defendant acted with the specific intent to kill, or that the defendant acted with a reckless and wanton disregard for human life that was extreme in nature, and was aware that his conduct created an extreme risk of death or serious bodily injury.
The fact that a reasonable person would have been aware of the risk would not sustain a finding of malice. To prove malice aforethought, the government must show that the defendant acted with callous and wanton disregard of human life, and an extreme indifference to the value of human life. Only a finding of extreme recklessness regarding homicidal risk will support an inference of malice aforethought.
Trial Tr. 39^0 (Nov. 9, 2010).
No one disputes that the foregoing instruction was correct as far as it went and Williams faces an especially steep climb in claiming prejudice from its failure to go further. Henderson, 431 U.S. at 155, 97 S.Ct. 1730 (“An omission, or an incomplete instruction, is less likely to be prejudicial than a [court’s] misstatement of the law.”). For reasons already explained, the judge would have been unwise, at the least, to adorn the instruction with fact-specific guidance about what evidence may have satisfied or negated the intent element. See Quercia, 289 U.S. at 470, 53 S.Ct. 698; Starr, 153 U.S. at 626, 14 S.Ct. 919; Bowen, 437 F.3d at 1018; Hardin, 50 F.3d at 1294; Duke, 928 F.2d at 1421; see also, e.g., United States v. Grover, 485 F.2d 1039, 1041-44 (D.C. Cir. 1973) (affirming district court’s refusal to instruct on which aspects of defendant’s conduct would make him aggressor for purpose of self-defense instruction). Additional clarification is always possible. But the cited cases tell us that it is not always necessary or even prudent.
Fourth, to accommodate the defense at least in part, the district court modified the jointly-proposed consent instruction by removing language to the effect that consent “should not be considered.” See Trial Tr. 15-18 (Nov. 9, 2010). The court’s final consent charge, to which both parties agreed, was as follows:
Consent is not a defense to second degree murder or involuntary manslaughter. Even if you find that the victim consented to the initial assault, you may not consider consent as a defense. It is settled that a victim cannot consent to an assault that is likely to result in death or grievous bodily injury; further, under no circumstances is consent a defense to the crime of homicide.
Id. at 46. This instruction was plainly correct. See, e.g., Glucksberg, 521 U.S. at 714, 117 S.Ct. 2258; Woods, 65 A.3d at 672; Durr, 722 So.2d at 135; Hiott, 987 P.2d at 136-37; cf. Maj. Op. 16 n.5 (declining to decide whether instruction was correct).
Fifth, notwithstanding the defense’s failure to propose a legally correct curative instruction, the district court offered yet another accommodation: the model “Proof of State of Mind” instruction from the Criminal Jury Instructions for the District of Columbia (commonly known as the Red-book). Trial Tr. 14 (Nov. 9, 2010). The instruction would have emphasized that the jury could consider “all” of the objective facts and circumstances in determining Williams’s mental state, supplying *29 much of the clarification Williams sought.[3] Id. By offering the instruction, the court accommodated the defense as much as possible without erroneously injecting “consent” into the mix.
Williams declined the instruction. Trial Tr. 15 (Nov. 9, 2010). Yet he now claims that “the district court refused to give any additional instruction to the jury,” Appellant’s Reply Br. 26, and that the instructions “took away from the jury’s consideration the most crucial surrounding facts and circumstances,” Appellant’s Br. 64. I see no reason to grant a new trial to a defendant who could have averted any conceivable error or prejudice if he had agreed to the court’s proposal. Had the Redbook instruction been given, it would have provided further clarification — if any were needed — that nothing in the charge “forb[ade] the jury from considering” Johnson’s words during the jump-in.[4] Maj. Op. 17-18 (emphasis omitted).
B. The Mens Rea Evidence Was Strong
Let me recap the analysis so far. Williams seeks reversal because of a brief legal statement the prosecutor made during nearly a full day of arguments, which arguments Were followed the next morning by extensive jury instructions. The district court correctly instructed the jurors on mens rea, told them to accept the court’s legal instructions and emphasized that they should consider all of the evidence. The court also amended the jointly-proposed consent instruction to accommodate the defense’s concern about the prosecutor’s argument. Given the charge as a whole, and even assuming the prosecutor misstated the law, a curative instruction that separately detailed less than all of the evidence relevant to mens rea would most likely have been reversible error. Williams offered such a curative instruction anyway. The court correctly rejected it because it would have confused the jury by conflating Johnson’s state of mind with Williams’s. Still, the court offered an alternative that would have addressed the essence of the defense’s concern. The defense declined the alternative.
I believe Williams would have suffered no prejudice from any prosecutorial error *30 had the issue of his mens rea been close: the court’s charge cured all ills. See Boyde, 494 U.S. at 384, 110 S.Ct. 1190 (“[Arguments of counsel generally carry less weight with a jury than do instructions from the court.”); Watson, 171 F.3d at 702 (in assessing prejudice from prosecutorial misstatements, “the ameliorative effects of jury instructions are not to be underestimated”); see also Venable, 269 F.3d at 1091-92 (court’s correct burden-of-proof instruction mitigated prosecutor’s misstatement of law on same issue, court telling jurors “it was the court’s responsibility to apprise [them] as to the law”). To complete the analysis, however, I emphasize my view that “Williams’s awareness of the risk” to Johnson was not — as the majority erroneously concludes, Maj. Op. 15-16 — a “close” question.
The majority observes that no serious injuries had occurred during earlier jump-ins. Maj. Op. 15-16. But this jump-in was different in crucial ways that would have been obvious to Williams. There were nine participants whereas the usual complement had been four to six. Williams, the ringleader and a prime participant, was about a foot taller than Johnson. When Williams punched Johnson in the mouth at the outset,- “Johnson went straight down ... to the ground.” Trial Tr. 34 (Oct. 29, 2010). No one had ever fallen on the first punch before. Williams hit Johnson in the face several more times and Johnson went down repeatedly. When he got up, “everybody” attacked him “like ... piranhas.” Id. Williams eventually “stomped on” him. Trial Tr. 30 (Oct. 25, 2010). That, too, was not “part of the rules” and had never happened before. Id. The other gang members “[f]ollow[ed] suit” in kicking Johnson, id., who “was curling up in a ball,” id. at 31. When the kicking stopped, one participant lifted Johnson to his feet and gang members held him up while punching him. At least one witness “had never seen” that either. Trial Tr. 35 (Oct. 29, 2010). Finally, the jump-in lasted for some indeterminate period beyond the standard six minutes because gang members, including Williams, continued beating Johnson after “time” had repeatedly been called. Trial Tr. 31 (Oct. 25, 2010); see Trial Tr. 143 (Oct. 29, 2010) (“[everybody who was not holding” Johnson up was beating him, including Williams, “and no one stopped” when “time” was called first two times).
The majority notes that “members repeatedly asked Johnson if he wanted to continue with the initiation and testified that they would have stopped if he said no.” Maj. Op. 15. But after Johnson’s attackers lifted him to his feet — at which point “[h]e looked scared.for his life,” Trial Tr. 46 (Oct. 26, 2010) — they stopped asking him if he wanted to continue, Trial Tr. 47 (Oct. 29, 2010). And there is no evidence— understandably — that Johnson, on his own, insisted on continuing after that point.
The majority says “Johnson had no unmistakable outward signs of major injuries after the jump-in.” Maj. Op. 15. But he was bleeding from the mouth and walked away from the scene “[l]ike a drunk person.” Trial Tr. 31-32 (Oct. 25, 2010). Those could be signs of either minor or major physical trauma. A gang leader who had delivered a severe beating with eight other men for over six minutes would not — unless extremely reckless- — rule out major trauma. A reasonable jury could easily infer that Williams intended a serious injury because that is, after all, the natural and probable consequence of a serious beating. See United States v. Mejia, 597 F.3d 1329, 1341 (D.C. Cir. 2010) (upholding jury instruction that “[y]pu may infer but are not required to infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted”) (internal quotation omitted); see also supra note 3.
*31 The majority points to testimony from a defense expert that Johnson had an “underlying medical trait” that contributed to or even “primarily] cause[d]” his death. Maj. Op. 15-16. But the same expert— roundly rebutted by government experts in any event — acknowledged that “the manner of Sergeant Johnson’s death was ... homicide” because “[t]he contributory cause ... was injury at the hands of others.” Trial Tr. 104 (Nov. 3, 2010).
The majority gives no weight to Williams’s depraved refusal of Johnson’s request for medical attention. I think that is spectacularly mistaken. It is true, as Williams notes, that the “ ‘material issue is [his] state of mind at the time of the homicide.’ ” Appellant’s Br. 63 (quoting United States v. Johnson, 879 F.2d 331, 334 (8th Cir. 1989)) (emphasis in Johnson). He cites no authority, however, that would exclude from “the time of the homicide” the immediate aftermath of a severe beating while the victim still clings to life.
The very definition of homicide is “[t]he killing of one person by another,” Blaok’s Law DICTIONARY 851 (10th ed. 2014), which means the crime is not complete unless and until the victim dies, see Trial Tr. 38 (Nov. 9, 2010) (district court instructed jurors that “[f]irst” element government had to prove was “that the defendant unlawfully killed Juwan Johnson”). And the available case law makes clear that a defendant’s refusal of medical attention for a victim he has beaten is strong evidence of murder, particularly if the defendant’s aim is to conceal the beating. See, e.g., United States v. Sarracino, 340 F.3d 1148, 1162—64 (10th Cir. 2003) (violation of Confrontation Clause was harmless beyond reasonable doubt in second-degree murder prosecution where evidence “overwhelmingly” showed defendants had badly beaten victim, “knew that the victim was severely hurt” and nevertheless “decided to remove the victim from the scene in hopes of avoiding detection of the crime”);[5] cf. United States v. Conatser, 514 F.3d 508, 522-24 (6th Cir. 2008) (affirming district court’s conclusion, at sentencing, that defendant’s failure to request medical attention for prisoner he had beaten constituted malice); United States v. McDougle, 82 Fed.Appx. 153, 157-58 (6th Cir. 2003) (unpublished) (affirming district court’s conclusion, at sentencing, that defendants’ “efforts at covering up [victim’s] injuries” from their earlier beating constituted malice when cover-up prevented victim from getting proper medical attention).
Here, the continuum of depravity began with the beating and extended through Williams’s refusal of Johnson’s request for medical attention. After the jump-in, someone asked Williams: “[W]hat if he has to go to the hospital[?]” Trial Tr. 93 (Oct. 29, 2010). Williams initially responded that “if he has to go to the hospital, tell them he got jumped downtown.” Id. But he assigned a gang member, Charris, to stay with Johnson and “watch” him. Trial Tr. *32 59 (Oct. 26, 2010). That was not altruism. When Johnson first said “that he wanted to go to the hospital,” Charris “told him that ... I couldn’t take him because there was no way for me to tell them how he got the bruises on him.” Id. at 63. In a fateful phone call about 20 minutes later, Williams directed that Johnson not be taken to the hospital. Viewing the evidence as a whole, I believe it shows in stark relief that the reason Williams assigned Charris to watch Johnson was to ensure that Johnson would not seek care on his own and thereby reveal the beating to outsiders. That is malice on stilts.
The prejudice inquiry, I recognize, “is ‘not a mere sufficiency-of-the-evidenee inquiry.’ ” Maj. Op. 15 (quoting United States v. Smart, 98 F.3d 1379, 1391 (D.C. Cir. 1996)). But neither does it demand overwhelming evidence in order to affirm, at least where the jury charge is correct and as thorough as the one here. Cf. Brecht v. Abrahamson, 507 U.S. 619, 639, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (prosecutorial error was harmless under Kotteakos standard where “evidence of guilt was, if not overwhelming, certainly weighty”). The evidence was unquestionably strong enough (and, I believe, overwhelmingly so) to reject Williams’s prejudice claim.
* :¡: :¡: * *
In my view, the prosecutor did not misstate the law. And even if she did, I am confident that any “error did not influence the jury, or had but very slight effect” in view of both the compelling evidence of malice and especially the jury charge, which was correct and measured in every particular. Kotteakos, 328 U.S. at 764, 66 S.Ct. 1239. The mischief the majority’s holding is likely to cause is neither theoretical nor slight. My colleagues have found reversible error in an experienced and evenhanded trial judge’s refusal to single out specific — and irrelevant — evidence in instructing the jury in a homicide prosecution. Caveat the trial bench.
Accordingly, I respectfully dissent from the reversal of Williams’s second-degree murder conviction, a conviction well warranted for his role in Johnson’s brutal beating and death.

. I join Parts I and II of the majority opinion in full. I join Part IV insofar as it upholds Williams's witness-tampering conviction. Because my colleagues reverse the murder conviction based on the prosecutor's alleged misstatement of law, they do not decide whether Williams’s other claims of prosecutorial misconduct or his challenge to certain evidentia-ry rulings would also warrant reversal of the murder conviction. I would reject those claims across the board.

. In view of all of the evidence, however, I do not agree that Johnson’s apparent bravado was as exculpatory as my colleagues hold. See infra Point IV.B.

. The model charge reads in full: "Someone's [intent] [knowledge] [insert other appropriate state of mind] ordinarily cannot be proved directly, because there is no way of knowing what a person is actually thinking, but you may infer the someone's [intent] [knowledge] [other appropriate state of mind] from the surrounding circumstances. You may consider any statement made or acts [done] [omitted] by [name of the defendant], and all other facts and circumstances received in evidence which indicate his/her [intent] [knowledge] [other appropriate state of mind]. [You may infer, but are not required to infer, that a person intends the natural and probable consequences of acts s/he intentionally did or did not do.] It is entirely up to you, however, to decide what facts to find from the evidence received during this trial. You should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that [name of the defendant] acted with the necessary state of mind.” Criminal Jury Instructions for the District of Columbia, No. 3.101 (5th ed. 2009).

. To repeat, the jury was told that "[e]ven if you find that the victim consented to the initial assault, you may not consider consent as a defense.” Trial Tr. 46 (Nov. 9, 2010) (emphasis added). By its terms, then, the instruction did not "forbid[]” the jury from considering Johnson’s words. Maj. Op. 17-18 (emphasis omitted).
Let me briefly reply to my concurring colleague, who mistakenly emphasizes trial counsel's role in explaining the law to the jury, musing "Who’s right about the law?" Concur. Op. 2. The answer is simple: It is the trial judge who is the sole lawgiver and, to the extent he needed to clear up the "white noise” produced by counsels’ differing legal arguments, he did so.

. In Sarracino, the district court instructed the jurors in part: “You also are permitted to find malice aforethought ... if you find that a person, while aware of a serious risk of death, failed to act after having put another human being in a position of danger and creating for himself a duty to rescue or to safeguard that other human being.” 340 F.3d at 1162 (internal quotation omitted). In closing, the government argued that the defendants had "created for themselves a duty to save” the victim but 'Te[ft] him to his own devices to die,” which proved malice. Id. at 1163 (internal quotation omitted). The Tenth Circuit quoted with approval both the instruction and the closing argument, finding them “important” to its conclusion that the Confrontation Clause violation was harmless. Id. at 1162-63. Similarly, the prosecutor here argued in closing that Williams's refusal of Johnson’s request for medical attention was a “betrayal” that led to Johnson's death. Trial Tr. 38 (Nov. 8, 2010). Just so.